IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 94-10922
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSEPH GROSZ,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Northern District of Texas
_____

February 22, 1996

Before REAVLEY, JOLLY, and WIENER, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In this case, involving crimes of bank fraud, we primarily consider Joseph Grosz's contention that the district court violated the Speedy Trial Act, 18 U.S.C. § 3161-3174, by allowing 354 non-excludable days to elapse between the final disposition of Grosz's interlocutory appeal and the filing of his motion to dismiss. The crucial question is whether the proceeding conducted four days before trial, relating to Grosz's pending motion in limine, constituted a hearing within the meaning of the Act. We hold that the court did in fact conduct a hearing. Thus, the 354 days in question are properly excludable from calculation under the Speedy Trial Act. As to the other issues raised by Grosz, including that

various instances of prosecutorial misconduct deprived him of a fair trial and that his conspiracy conviction is barred by double jeopardy, we find them meritless. Accordingly, we affirm Grosz's convictions.

I

Grosz was a commercial lending officer for San Jacinto Savings Association ("San Jacinto"), located in Houston, Texas. James P. McClain was a Texas businessman involved in real estate. In late 1984 or early 1985, during a flight to Chicago on McClain's private plane, Grosz and McClain devised a scheme jointly to purchase control of a Chicago savings and loan.

In order to generate funds to purchase the savings and loan in accordance with their plan, Grosz helped McClain to obtain a loan from People's Heritage Federal Savings and Loan Association ("People's") through a series of related transactions ("Plano/Flower Mound II Transactions"). In pertinent part, Grosz, acting in his capacity as a lending officer for San Jacinto, arranged for San Jacinto to release a second lien it held on forty-three acres of undeveloped land in Plano, Texas, to subordinate a lien it held to a People's lien, and to waive its rights under an agreement that would have entitled San Jacinto to receive $1.5 million from McClain at the closing of one of the transactions. San Jacinto did not receive any consideration in return for these actions. Grosz, however, received from McClain $1 million of the proceeds of People's loan. McClain also provided to Grosz $600,000

of his profits from two "land flip" transactions[1] involving San Jacinto ("Bedford and Flower Mound I Transactions").

Shortly after the Plano/Flower Mound II Transactions, McClain decided that he no longer wanted to own or control a savings and loan. McClain asked Grosz to return half of the money. The two men ultimately agreed that Grosz would return $600,000 of the $1.6 million diverted to Grosz. Grosz actually paid McClain only $360,000 of this amount through two checks, one for $210,000 dated September 26, 1986, and the other for $150,000 dated December 9, 1987.[2]

## II

Grosz was charged on December 11, 1991 in a twelve-count indictment for the offenses of conspiracy to commit bank fraud, bank fraud, unlawful receipt of gifts for procuring loans, misapplication of loan funds, wire fraud, and aiding and abetting the commission of these offenses. He was arraigned on January 16, 1992. Grosz's counsel filed seventeen pretrial motions on January 27, including a motion to dismiss on double jeopardy grounds and a motion in limine to exclude evidence of subsequent financial conditions and events. The government responded to these motions on February 3. On May 7, the district court held the first

---

[1] See United States v. Sallee, 984 F.2d 643, 644 (5th Cir. 1993) (describing land flips).

[2] The second check was made payable to Sharon Mains, who was then McClain's girlfriend.

pretrial conference. The court ruled orally on seven of Grosz's motions. The court also entered an order denying Grosz's double jeopardy motion and one other motion. Finally, the court stated that it was going to keep the remaining motions, including the motion in limine, "under advisement" pending resolution of Grosz's interlocutory appeal from the denial of his double jeopardy motion.

This court affirmed the district court's denial of Grosz's double jeopardy motion in an unpublished opinion. United States v. Grosz, 977 F.2d 577 (5th Cir. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1284, 122 L.Ed.2d 676 (1993). The interlocutory appeal formally concluded on March 4, 1993. The district court next took action on November 15, 1993, more than eight months later, when it denied one of seven pending motions without a hearing. Between that day and March 2, 1994, the court ruled on five of the remaining six motions without conducting a hearing on any of them. Grosz filed a motion to dismiss the indictment for pre-indictment delay on February 22, 1994. On March 3, the district court held the second pretrial conference, at which it granted Grosz's pending motion in limine after a brief exchange with an attorney for the government. Although present in the court at that time, Grosz's counsel was not addressed by the district court until after the court had ruled on the motion in limine. Grosz filed a motion to dismiss for a violation of the Speedy Trial Act on March 8. The court denied this motion on March 11.

Grosz chose not to testify at trial. Grosz's counsel suggested that McClain, who was testifying under a plea agreement, was fabricating his testimony to assist the government. In opening and closing arguments, Grosz's counsel maintained that the $600,000 that Grosz received from McClain was a loan made "in connection with investments that Mr. McClain wanted to do with Mr. Grosz." When the "investments" failed to materialize, counsel argued, Grosz returned a substantial portion of the money to McClain.

Grosz's counsel also argued that the $1 million payment was for "consulting work" that Mr Grosz did "in connection with a real estate transaction involving Mr. McClain." Grosz's counsel did not introduce any evidence of a consulting agreement. An accountant testified on behalf of Grosz that he entered the money on the books of Mortgage & Equity Resources, a Chicago real estate brokerage owned by Grosz and his wife, as a "commission." Grosz also denied that San Jacinto received no benefit in return for the various rights it waived in connection with the Plano/Flower Mound II Transactions. He produced witnesses to testify to that effect.

Grosz was convicted of conspiring to commit bank fraud (Count 1); bank fraud (Count 10); and unlawful receipt of gifts for procuring loans (Counts 11 and 12). Counts 10 through 12 involved the Plano/Flower Mound II Transactions. Grosz was acquitted of the other eight counts on which he was indicted, all relating to the Bedford and Flower Mound I Transactions. The court sentenced him to five years' imprisonment on the conspiracy count, to be followed

by concurrent five-year terms of probation on the remaining three counts of conviction. Grosz was also ordered to pay restitution in the amount of $1,600,000 and special assessments.

### III

Grosz first contends that the district court should have dismissed his indictment based on a violation of the Speedy Trial Act because 354 non-excludable days elapsed between the final disposition of his interlocutory appeal and the filing of his motion to dismiss (March 5, 1993, to February 21, 1994). Specifically, Grosz asserts that an exchange in open court, shortly before trial, between the district judge and a government attorney concerning Grosz's pending motion in limine did not constitute a hearing triggering an exclusion of the 354 days under 18 U.S.C. § 3161(h)(1)(F). This court reviews the factual findings supporting a Speedy Trial Act ruling using the clearly erroneous standard and the legal conclusions de novo. United States v. Tannehill, 49 F.3d 1049, 1051 (5th Cir.) (citation omitted), cert. denied, ___ U.S. ___, 116 S.Ct. 167, 133 L.Ed.2d 109 (1995).

### A

"The Speedy Trial Act is designed to ensure a federal defendant's Sixth Amendment right to a speedy trial, and to reduce the danger to the public from prolonged periods of the defendant's release on bail." United States v. Johnson, 29 F.3d 940, 942 (5th Cir. 1994). It requires that a defendant be tried within seventy days of indictment or of the day the defendant first appears before

the judge or magistrate, whichever is later.  18 U.S.C. § 3161(c)(1) (1994).  If more than seventy days pass between this date and the trial, the "indictment shall be dismissed on motion of the defendant."  18 U.S.C. § 3162(a)(2) (1994).

Certain delays are excluded from this calculation under section 3161(h).  Section 3161(h)(1)(F) ("Subsection F") excludes "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion."  18 U.S.C. § 3161(h)(1)(F) (1994).  "Once a hearing has been held on a motion and all necessary additional materials submitted to the court, or once a motion not requiring a hearing is filed along with necessary supporting materials, § 3161(h)(1)(J) limits the excluded period to thirty days."  United States v. Bermea, 30 F.3d 1539, 1566 (5th Cir. 1994) (citing Henderson v. United States, 476 U.S. 321, 329, 106 S.Ct. 1871, 1876, 90 L.Ed.2d 299 (1986)), cert. denied sub nom., Rodriguez v. United States, ___ U.S. ___, 115 S.Ct. 1113, 130 L.Ed.2d 1077 (1995), and cert. denied sub nom., Garza v. United States, ___ U.S. ___, 115 S.Ct. 1825, 131 L.Ed.2d 746 (1995).

The Supreme Court has established that Subsection F excludes "all time between the filing of a motion and the conclusion of the hearing on that motion, whether or not a delay in holding that hearing is `reasonably necessary.'"  Henderson, 476 U.S. at 330, 106 S.Ct. at 1877.  The Supreme Court observed that although Congress recognized the potential for abuse of the exclusion

-7-

provided by Subsection F, "Congress clearly envisioned that any limitations should be imposed by circuit or district court rules rather than by the statute itself." Id. at 327-28, 106 S.Ct. at 1875-76.

The crucial question under Subsection F is whether a hearing was held on a motion. Clarifying prior Fifth Circuit precedent, the court in Johnson held that the speedy trial clock is not tolled simply because a pretrial motion is pending. "Instead, a court must look more closely into the particular circumstances of that motion, e.g., whether there was a hearing on the motion, or whether the motion was taken under advisement, to determine whether certain days are excludable." Johnson, 29 F.3d at 943 & n.3 (citation omitted). The court focused specifically on the question whether a hearing was held on each of the four motions at issue in Johnson. Id. at 943-45. For example, it concluded that "because no hearing of any sort preceded the court's ruling, we consider the [defendant's motion in limine] to have been under advisement beginning on . . . the date the motion was filed." Id. at 944. The court noted that "[t]he result we reach in this case might well be different had the trial court held a hearing immediately before or during trial on the motion in limine or the James motion, typically a motion postponed until trial." Id. at 944 n.8.[3]

_____

[3]The court in Bermea concluded that pending James motions do toll the speedy trial clock when they are heard and ruled upon at trial. 30 F.3d at 1568.

B

This case presents the question whether, within the meaning of

the Speedy Trial Act, the proceeding at the second pretrial

conference[4] constituted a hearing on Grosz's pretrial motion in

limine.[5]  If it constituted a hearing, there will have been no

---

[4]The district court held the second pretrial conference four days prior to the beginning of the trial.

[5]The following exchange occurred at the second pretrial conference:

THE COURT:     91-390, United States versus Grosz.  It appears we have two motions currently pending.  One of them is the defendant's motion in limine to exclude evidence of subsequent financial conditions, and then defendant's motion to dismiss the indictment based on preindictment delay.
      All right.  Does the government oppose the defendant's motion in limine?
MR. FRANK:     Yes, sir.
THE COURT:     On what basis?
MR. FRANK:     We believe that the evidence of loss occasioned by the transactions in which this defendant participated in shows evidence of intent and also a pattern of dealings with these institutions.  And the jury should be able to consider this evidence to fully appreciate the extent of the defendant's conduct in this particular series of transactions which resulted in substantial losses for two different financial institutions.
THE COURT:     Would your agreement [sic] be the same if the properties had sold at a profit?
MR. FRANK:     I believe the jury should be entitled to understand exactly what did happen to the properties as to whether they were profitable or sold at a loss.
      It's important to know how this defendant's activities and arrangements for these loans and approving these loans played into the overall financial structure of the institutions and what ultimately happened to these entities.
THE COURT:     I'm going to grant the motion in limine. The government shall not refer to any losses on the properties in the presence of the jury without first approaching the court and obtaining a ruling from the

-9-

violation of the Speedy Trial Act because the clock would have been tolled at least until the hearing.  If it did not constitute a hearing, the Speedy Trial Act will have been violated because the clock would have started running again after completion of Grosz's interlocutory appeal on March 4, 1993.[6]  See 18 U.S.C. § 3161(h)(1)(E) (1994).

The Fifth Circuit observed in a recent case that the Speedy Trial Act itself does not define "hearing" and noted that it could not find any authorities addressing the issue.  Tannehill, 49 F.3d at 1053.  Emphasizing the importance of interpreting the term in the context of the Speedy Trial Act, id. (citations omitted), the court declared that because Congress was addressing preliminary motions in Subsection F, it could not have meant to require the presentation of testimony or other evidence for there to be a "hearing."  Id.  It did not determine the "precise parameters" of

---

court if you intend to offer such evidence.
　　All right.  Defendant's motion to dismiss the indictment.
　　Is this motion going to require a hearing?
MR. SAMUELS:  Good morning, Your Honor, Elliott Samuels on behalf of Mr. Grosz.

[6]In its order denying Grosz's motion to dismiss, the district court ruled that the pendency of the motions held "under advisement" from the first pretrial conference tolled the speedy trial clock under Subsection F without reaching the "hearing" question.  This rationale was plainly incorrect.  Nevertheless, we may affirm the judgment of the district court on any basis supported by the record.  Soujourner T. v. Edwards, 974 F.2d 27, 30 (5th Cir. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1414, 122 L.Ed.2d 785 (1993), and cert. denied sub. nom., Connick v. Soujourner T., ___ U.S. ___, 113 S.Ct. 1414, 122 L.Ed.2d 785 (1993).

a "hearing" because it concluded that the term "includes a situation in which the district court hears argument of counsel and considers it prior to making its ruling, as was done in this case." Id.

Tannehill's approach to the problem of interpreting "hearing" plainly indicates that Grosz's reliance on due process cases to define "hearing" for purposes of Subsection F is misplaced. See, e.g., Cleveland Board of Education v. Loudermill, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985). Instead, we must look to the Speedy Trial Act itself. In holding that the Speedy Trial Act excludes time after a hearing to await additional filings from the parties, the Supreme Court emphasized that "[t]he provisions of the Act are designed to exclude all time that is consumed in placing the trial court in a position to dispose of a motion." Henderson, 476 U.S. at 331, 106 S.Ct. at 1877 (citing S.Rep. No. 96-212, pp. 9-10 (1979)). This purpose identified by the Supreme Court suggests that a relatively broad definition of "hearing" is appropriate.

A review of the transcript from the second pretrial conference convinces us that the exchange between the district court and the government constituted a "hearing" for purposes of the Speedy Trial Act. As in Tannehill, we need not determine the precise parameters for a "hearing" in this context because the term includes a situation, as here, in which the district court hears the argument

of, and questions, counsel for the party against whom the ruling on the motion is made.

The district court's disposition of other pretrial motions supports our conclusion that this was a "hearing" for purposes of Subsection F. On the day before the second pretrial conference, the district court ruled on four other motions (which similarly had been pending since the first pretrial conference) based only on the filings of the parties. That the district court chose not to rule on the motion in limine at the same time indicates that the district court needed additional information or clarification in order to dispose of the motion, which it obtained through its questioning of the government attorney the next day.[7]

Grosz, arguing for a different application of the statute, points out that 18 U.S.C. § 3161(h)(1)(J) (Subsection J) applies to motions "actually under advisement by the court." Grosz then argues that the district court's statement at the first pretrial conference that he was taking the motion "under advisement" when describing the status of the motion in limine establishes that it was a non-hearing motion for which only thirty days were excludable pursuant to Subsection J. Henderson, 476 U.S. at 329, 106 S.Ct. at 1876. Grosz also contends that this motion was a non-hearing

_____

[7]We acknowledge that we would not recognize the exchange as a "hearing" if the record demonstrated an attempt on the part of the district court or the government to manufacture a "hearing" to avoid the operation of the Speedy Trial Act. See United States v. Walker, 960 F.2d 409, 413 (5th Cir.), cert. denied, ___ U.S. ___, 113 S.Ct. 443, 121 L.Ed.2d 362 (1992). Such is not the case here.

motion because the parties never requested and the district court never formally set a hearing on it.  We are not persuaded by these arguments.

The plain language of neither Subsection F nor Subsection J requires a court to make any on-the-record finding as to the status of a motion.[8]  The exclusion for a continuance provided by section 3161(h)(8), in contrast, requires a court to "set[] forth, in the record of the case, either orally or in writing, its reasons . . . ."  18 U.S.C. § 3161(h)(8).  This difference in statutory language in the same section leads us to the conclusion that a court's description of the status of a motion cannot be dispositive of the question whether a motion is "actually under advisement" for purposes of Subsection J.  Similarly, the language of Subsection F does not impose a requirement that the court formally set a motion for hearing.  As indicated above, the crucial question concerning the exclusions provided by Subsection F and Subsection J is whether the court actually holds a hearing on a motion.

C

We thus conclude that the district court properly excluded the time between the end of Grosz's interlocutory appeal and the hearing on the motion in limine under Subsection F.  The trial having commenced within seventy non-excludable days of Grosz's

---

[8]Nor do our cases suggest such a requirement.  See, e.g., Tannehill; Johnson.

-13-

first appearance before the court, there was no violation of the Speedy Trial Act in this case.

IV

Grosz next raises a number of claims concerning alleged prosecutorial misconduct that supposedly deprived Grosz of a fair trial. We address three of those claims below.[9]

A

Grosz asserts that the government persistently and "impermissibly invited the jury to infer Mr. Grosz's guilt from his constitutionally protected silence" in its closing argument.[10] It

---

[9]After a review of the briefs of the parties and the record, we hold that the following instances of alleged prosecutorial misconduct are lacking in any merit and do not require discussion: (1) the alleged false testimony of Jerry Nicholson and (2) the alleged improper cross-examination of a defense handwriting expert.

[10]Grosz points to the following remarks by the government:

(1) "There is no evidence in this case of the plane ride that he discussed with Mr. Grosz did not happen --"
(2) "The only testimony that's out there is he went on this plane ride --"
(3) "With respect to why Joe Grosz received the $1 million through Mortgage and Equity Resources, the only explanation that has been offered in this case for why that money was paid is --"
(4) "Ladies and gentlemen, the only explanation that has come from that witness stand as to why this money was paid, the $1 million, is the testimony of James P. McClain . . . ."
(5) "McClain's statement stands alone . . . ."
(6) "Ladies and Gentlemen, there is simply no other explanation that I have heard other than Mr. McClain's as to why this money has been paid --"
(7) "Well, McClain has given you the only explanation that has ever been offered, and that was to further the stock purchase agreement . . . ."
(8) "That's why Mr. Grosz has been hesitant to come forward with information that, oh yeah, I brokered the deal."

-14-

is, of course, improper for a prosecutor to comment on a defendant's exercise of his Fifth Amendment rights. Griffin v. California, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). The government is not prohibited, however, from commenting on the defense's failure to counter or explain the evidence as opposed to the defendant's failure to testify. United States v. Guzman, 781 F.2d 428, 434 (5th Cir.), cert. denied, 475 U.S. 1143, 106 S.Ct. 1798, 90 L.Ed.2d 343 (1986); United States v. Bright, 630 F.2d 804, 825 (5th Cir. 1980).

This court applies a two-tiered test to Grosz's claim. The court first must determine whether the remarks were constitutionally impermissible. If the court finds them to be impermissible, the court must consider whether they were harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The test for determining whether the prosecutor's remarks were constitutionally impermissible is: "(1) whether the prosecutor's manifest intent was to comment on the defendant's silence or (2) whether the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence." United States v. Collins, 972 F.2d 1385, 1406 (5th Cir. 1992) (internal quotation and citation omitted), cert. denied, ___ U.S. ___, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993), and cert. denied sub nom., Ross v. United

States, ___ U.S. ___, 113 S.Ct. 1812, 123 L.Ed.2d 444. The prosecutor's intent is not manifest if there is some other, equally plausible explanation for the remark. Id. As for the second possibility, "`the question is not whether the jury possibly or even probably would view the challenged remark in this manner, but whether the jury necessarily would have done so.'" Id. (quoting United States v. Carrodeguas, 747 F.2d 1390, 1395 (11th Cir. 1984), cert. denied sub nom., Hernandez-Cartaya v. United States, 474 U.S. 816, 106 S.Ct. 60, 88 L.Ed.2d 49 (1985)). Both inquiries are properly conducted by reviewing the challenged remarks in context. United States v. Jones, 648 F.2d 215, 218 (5th Cir. 1981).

In the context of the case, the first seven of eight remarks challenged by Grosz clearly focused on the defense's failure to counter the government's evidence. As such, they are not constitutionally impermissible comments on Grosz's decision not to testify. Guzman, 781 F.2d at 434. The remark that appears on its face to be most damaging is the one in which the government uses Grosz's name. The immediate context illuminates the meaning of this remark:

> If Mr. Grosz is pretending or suggesting to you that he could on the one hand release this lien on the Plano property and then turn around and accept a million dollar brokerage commission from the sale of that property from McClain to Nicholson, I would suggest to you that you read again Government's Exhibit Number 23, the conflict of interest policy of San Jacinto Savings and Southmark Corporation, which tells you point blank that you can't do that.

That's why Mr. Grosz has been hesitant to come forward with information that, oh yeah, I brokered that deal.

We hold that this statement, when read in context, does not manifest the government's intent to comment on Grosz's failure to testify. Instead, it offers to the jury a reason why the defense failed to show clearly that Grosz brokered the deal:[11] such a contention would have been contrary to the express conflict of interest policies of San Jacinto and Southmark. Thus, we are persuaded that the jury would not "naturally and necessarily" have construed it as a comment on his failure to testify.

B

Grosz next argues that the government intentionally elicited false testimony from McClain. The testimony concerned the $150,000 check drawn on a bank account of Mortgage & Equity Resources, Grosz's Chicago real estate brokerage firm, made out to Sharon Mains. Through the witness' testimony, the government suggested that the check had been altered, which was false.[12] Grosz asserts

---

[11]From its opening statement, the defense attempted unsuccessfully to establish a "consulting agreement" theory for the receipt of the $1 million from McClain.

[12]The following exchange occurred near the conclusion of McClain's testimony on direct:
Q.    Mr. McClain, is there something unusual about this check, other than it's made payable to your girlfriend?
A.    Well, it's like about every other document that's in here.
Q.    What's unusual about this check?
A.    If you notice the check is made out in handwriting. The -- this represents final payment by which note for

that the government knew that the check had not been altered after McClain received it when it engaged in this line of questioning. He contends that the bank had provided the government with a microfiche copy of the check years before the trial in response to a subpoena, which revealed that the check had cleared two days after it was issued with the typewritten notation on it.

Grosz must show that the following to obtain reversal of his conviction on the grounds that the government elicited false testimony: (1) the testimony was false, (2) the prosecution knew it was false, and (3) it was material. <u>United States v. Scott</u>, 48 F.3d 1389, 1394 (5th Cir.) (citation omitted), <u>cert. denied</u>, ___ U.S. ___, 116 S.Ct. 264, 133 L.Ed.2d 187 (1995). The false testimony is material if there is "any reasonable likelihood" that it could have "affected the judgment of the jury." <u>Giglio v. United States</u>, 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

---

$600,000.00 is paid in full, was typed on -- with a typewriter.
    Q.    You're referring to a note that appears directly below the handwritten name of Sharon Mains on the check?
    A.    Yes, that's correct.
    Q.    What is suggested to you by the fact that part of the document is completed in handwriting and part of it is completed in typewriting?
    A.    I would assume, as most of these other documents, that this was done at a later time.
    Q.    Do you know of your own personal knowledge as to whether or not this typewritten note was on the document at the time it was received by Sharon Mains?
    A.    No, because I was not in the city in which Sharon received the check at the time.

Grosz's claim fails because the record contains insufficient evidence to prove that the government elicited this testimony knowing it to be false. Grosz argues that the government had been furnished a microfiche copy of the check from the bank. He relies solely on the testimony of an FBI agent involved in subpoenaing documents from the bank:

> Q:    All right.  Would you -- by the way, when you subpoenaed the Boulevard Bank records you got a microfiche copy of the check, did you not?
> A.    Yes, they would have been microfiche.

(Emphasis added).  Since the agent had already testified that he had not reviewed the documents subpoenaed from the bank and had never seen a copy of the check, this answer cannot be viewed as a clear admission that the government had obtained a microfiche copy of the check in question; more likely, the statement is only an acknowledgement that the subpoenaed documents would have been microfiched copies.[13]

Even if the record showed that the government knowingly elicited this testimony, Grosz's claim would still fail because the testimony was not material.  This is not a case in which the false testimony remained uncorrected throughout the trial.  Instead, Grosz conclusively refuted McClain's testimony by the introduction of the microfiche copy of the check and by his examination of the

---

[13]The government argues in its brief that the relevant subpoenas show that the check in question was outside the scope of the government's request for documents.  We do not address this contention because the subpoenas are not part of the appellate record.

FBI agent concerning this copy of the check. The jury therefore could not have relied on this testimony to draw any adverse inference against Grosz. This testimony and its refutation also allowed Grosz to assert in his closing argument that he was the victim of a "very overzealous prosecution." In the light of the foregoing, we cannot say that there was "any reasonable likelihood" that the jury's judgment was affected by this false testimony.

C

Grosz also argues that the government knowingly allowed the false testimony of a government witness to stand uncorrected. According to Grosz, Edwin T. McBirney[14] falsely testified that his lawyers had not filed a Rule 35 motion to reduce his sentence.[15]

---

[14]McBirney was the former head of Sunbelt Savings. He testified about his role in the Plano/Flower Mound II Transactions. He was testifying pursuant to a plea bargain upon which he was sentenced to fifteen years in prison.

[15]Grosz excerpts the following portion of his defense counsel's cross-examination of McBirney:

Q. And as a result of that, since then you have been doing everything you possibly can to get the sentence reduced, have you not?
A. Since then I have been cooperating as did I before the sentence was handed down with the government, yes.
Q. But you have taken legal steps in an effort to obtain a reduction in your sentence, have you not?
A. Legal steps in what way?
As far as what --
Q. Well, have you or your lawyers on your behalf filed motions with the court requesting that the sentence be reduced after you were sentenced?
A. No, not yet.
Q. You have not filed a motion?
A. Rule 35?
Q. Yes.
A. No.

Because of this denial, Grosz claims that the jury was left with the impression that no remedial action was pending with respect to McBirney's fifteen-year sentence, which "obviously went directly to McBirney's motive, interest and bias as a government witness."

A thorough review of all of the relevant testimony convinces us that Grosz's claim is meritless.[16]  Immediately following the excerpt cited by Grosz, the following exchange occurred:

> Q.    And I'll ask you one more time:  Did those lawyers file the required motion within that 120-day period.
> A.    You asked me if they filed a rule 35 or filed a motion to extend the deadline for the filing?
> I'm not trying to argue.  I'm trying to understand what you're asking me for.

---

> Q.    When is the last time that you spoke with any of your attorneys concerning whether or not they have filed a rule 35 motion requesting a reduction of your sentence?
> A.    Yesterday.
> Q.    They're telling you that you have not filed such a motion?
> A.    We have not filed a rule 35, no, sir.
> Q.    Let me ask this pointedly, Mr. McBirney.
> If a hearing on your rule 35 motion wasn't set Tuesday of this week?
> A.    I don't know if it was set Tuesday of this week, but I'm saying to you that we have not filed a rule 35.
> We filed extensions to -- we have continued to file extensions, but we have not filed a rule 35.
> Q.    All right.  Was a hearing set to be conducted on that, whatever it is you filed, on Tuesday of this week?
> A.    No, sir.
> Q.    So tell me again what it is your understanding is that your lawyers have filed trying to get a lower sentence?
> A.    Nothing yet.

[16]Grosz's assertion that a side deal existed with the government in exchange for his testimony is based on unfounded speculation and is thus similarly meritless.

If you ask me if they extended the deadline, that's correct.

Q.   That's your understanding of it?

A.   Yes.

Q.   Now, have the attorneys -- your attorneys told you when you might expect a hearing on the motion?

A.   No.

Q.   Concerning the motion to reduce your sentence, you understood in the plea agreement the government reserved the right to oppose that, did they not?

A.   That's correct.

Q.   So they are holding that over you, so to speak, are they not?

A.   We haven't really discussed it.

Q.   You and your lawyers have not talked to the prosecution as to whether or not the U.S. Attorney's Office is going to oppose your request for a lower sentence?

A.   We haven't discussed what they're going to say about any lower sentence.  We have not discussed it with them.

* * *

Q.   Now, you understand, do you not, under that plea agreement, Mr. McBirney, that it is the prosecution over here that is going to decide whether or not you have told the truth.  The defense has got nothing to do with it.
     You understand that?

A.   Whether it's the defense or prosecution, I still have to tell the truth.

Q.   I understand.  But concerning your request for a lower sentence, you realize that it's the [prosecution] that's going to decide that?

A.   To my understanding, that is correct.

The transcript shows that at best McBirney's denial was based on a technicality of seeking a sentence reduction.  He was obviously confused about the specific legal steps taken by his lawyers to secure a lower sentence.  The testimony nevertheless clearly indicates that some sort of effort at sentence reduction was in process and that McBirney was beholden to the government at the time he was testifying.  Based on all of the relevant testimony we must reject Grosz's contention that the jury was left with the

-22-

impression that no remedial action was pending over which the government would have some influence.

V

Grosz's final claim is that his conspiracy conviction is barred by the Fifth Amendment's double jeopardy clause because it was part of a larger conspiracy for which he had been acquitted previously in Kansas. We have considered and denied Grosz's double jeopardy claim on interlocutory appeal in an unpublished opinion. United States v. Grosz, 977 F.2d 577 (5th Cir. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1284, 122 L.Ed.2d 676 (1993).

"The `law of the case' doctrine, a restriction self-imposed by the courts on themselves in the interests of judicial efficiency, generally operates to preclude a reexamination of issues decided on appeal either by the district court on remand or by the appellate court itself upon subsequent appeal." Conway v. Chemical Leaman Tank Lines, Inc., 644 F.2d 1059, 1061 (5th Cir. 1981) (citation omitted). In the criminal context, the law of the case doctrine prohibits this court from reconsidering an earlier decision denying a double jeopardy claim raised during an interlocutory appeal. United States v. Singleton, 49 F.3d 129, 134 (5th Cir.), cert. denied, ___ U.S. ___, 116 S.Ct. 324, 133 L.Ed.2d 225 (1995). An exception to this bar exists if the "evidence on a subsequent trial was substantially different." Young v. Herring, 938 F.2d 543, 547 (5th Cir. 1991) (citation omitted), cert. denied, 503 U.S. 940, 112 S.Ct. 1485, 117 L.Ed.2d 627 (1992). That is not the case here.

We thus conclude that the "law of the case" doctrine precludes reconsideration of our previous denial of Grosz's double jeopardy claim.

VI

For the foregoing reasons, we AFFIRM the judgment of the district court.

A F F I R M E D.