# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 9, 2010

No. 08-11090

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

RUBEN B. BOHUCHOT AND FRANKIE LOGYANG WONG,

Defendants–Appellants.

Appeals from the United States District Court
for the Northern District of Texas

Before SMITH, CLEMENT, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Ruben B. Bohuchot and Frankie Logyang Wong were convicted of bribery, conspiracy to commit bribery, and conspiracy to launder monetary instruments in connection with computer and technology contracts awarded by the Dallas Independent School District and programs that received federal funds. Bohuchot and Wong challenge these convictions and their respective sentences. We affirm the convictions and sentences.

**I**

Ruben Bohuchot and Frankie Wong were charged in a multi-count indictment for offenses relating to the award of computer technology contracts

No. 08-11090

by the Dallas Independent School District (DISD). At the time of the indictment, Bohuchot was DISD's chief technology officer. Wong was the president and co-owner of Micro Systems Engineering, Inc. (MSE), a computer reseller that contracted with larger companies to resell and maintain computer hardware.

Two contracts were at the center of the government's bribery and conspiracy allegations. The first was for a technology program called Seats Management, which provided computers, related services, and support for schools within the district. DISD awarded this contract, calling for payments totaling approximately $18 million, to a partnership between Hewlett-Packard (HP) and MSE in September 2002. MSE received at least $4,674,303 for its participation in the partnership. The second contract involved E-Rate, a federal program that provides money and technology to school districts that subsidize student lunches. DISD awarded this contract, contemplating payments of over $115 million, in December 2003 to a group of 13 companies called the Consortium, which included HP, Novell, and MSE. More than $35 million was paid to MSE on behalf of the Consortium between May 2003 and July 2005 for MSE's participation.

DISD used Requests for Proposals (RFP) to inform potential bidders of the scope, location, and requirements for its major technology projects. To insure fairness in the bidding process, information regarding forthcoming RFPs and their requirements was released to all competitors at the same time. The propriety of the relationship between Bohuchot and Wong came into question when a vendor who bid unsuccessfully for one of the DISD technology contracts lodged a complaint. Subsequent investigation by the government revealed substantial evidence that Wong and Bohuchot had engaged in an ongoing scheme in which Bohuchot provided valuable inside information regarding the RFP process to Wong in return for cash, vacation trips for Bohuchot and his family members, employment for Bohuchot's son-in-law, sporting event tickets,

2

No. 08-11090

and extensive use of two yachts owned by an MSE affiliate. There was evidence that Bohuchot provided insider information for approximately one year before the initial Seats Management RFP was released and that Bohuchot had met with Wong in Key West, Florida days before the release of that RFP. Witnesses for the government who were present at this latter meeting testified that Bohuchot shared a draft copy of the Seats Management RFP with Wong and associates at that time.

Wong and Bohuchot were convicted of violating and conspiring[1] to violate 18 U.S.C. §§ 666(a)(1)(B) and (2) (bribery concerning programs receiving federal funds), and of conspiracy to commit money laundering.[2] Bohuchot was also convicted of obstruction of the grand jury proceeding[3] and of making a false statement on a tax return,[4] but he has not appealed his convictions for these latter offenses. The district court sentenced Bohuchot to a 132-month term of imprisonment and Wong to a 120-month term of imprisonment. Wong brings forward six issues on appeal, arguing that (1) the government's proof and the charge to the jury constructively amended the indictment, (2) there was insufficient evidence to support the bribery theory on which Wong was indicted, (3) the prosecutor impermissibly commented on Wong's failure to testify, (4) the jury instructions were erroneous regarding money laundering because the *mens rea* element was "knowing" rather than "intentional," (5) the district court erred in using the total cost of ownership of two yachts in sentencing, and (6) the district court erroneously found multiple bribes rather than a single bribe. Bohuchot adopts Wong's argument and briefing regarding five of these issues.

---

[1] 18 U.S.C. § 371.

[2] 18 U.S.C. § 1956(h).

[3] 18 U.S.C. § 1512(c).

[4] 26 U.S.C. § 7206(1).

No. 08-11090

## II

We first consider the argument that the proof offered at trial by the government and the jury charge submitted by the district court permitted the jury to convict Wong and Bohuchot on theories that were not alleged in the indictment, thereby impermissibly constructively amending the indictment. The defendants rely on the Supreme Court's seminal decision in *Stirone v. United States*, in which the indictment alleged that Stirone had unlawfully interfered with interstate commerce in sand.[5]  At trial the prosecution presented not only evidence of interference with interstate commerce in sand but as to steel as well, and over the defendant's objection, the trial court's charge permitted the jury to convict based on a finding regarding either sand or steel.[6]  The Supreme Court held that this violated "the basic protection the grand jury was designed to afford" because it "subject[ed] the defendant to prosecution for interference with interstate commerce which the grand jury did not charge."[7]

The indictment presently at issue alleged that Bohuchot provided and Wong received non-public information relating to the Seats Management contract before the information was provided to other vendors who were competing with MSE, which assisted MSE in submitting the winning bid, and that Bohuchot signed documents authorizing DISD to enter into contracts benefitting MSE. The indictment also alleged that approximately six months before the Seats Management RFP was published for bidding, Bohuchot

---

[5] 361 U.S. 212, 213-14 (1960).

[6] *Id*. at 214.

[7] *Id*. at 218; *see also id*. ("The charge that interstate commerce is affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference.  It follows that when only one particular kind of commerce is charged to have been burdened a conviction must rest on that charge and not another, even though it be assumed that under an indictment drawn in general terms a conviction might rest upon a showing that commerce of one kind or another had been burdened.").

No. 08-11090

represented that a former employee of DISD, William Coleman, was then an employee of DISD when in fact he was a consultant for MSE.

Wong and Bohuchot contend that the government's theory of the case shifted during trial and that it urged the jury to convict the defendants on grounds that differed from those set forth in the indictment. The allegedly new grounds include theories that Wong bribed Bohuchot to (1) manipulate the flow of information to the DISD board of trustees, (2) select individuals who would be favorable to MSE to serve on committees that would evaluate the competing bids on the two contracts, (3) influence or pressure those committees, (4) create favorable scoring matrixes or tamper with the scores for evaluating the competing bids, (5) improperly influence contract negotiations, and (6) rush the RFP process.

The defendants failed to object to any of the evidence or arguments by the prosecution that they now urge constructively amended the indictment. They contend, however, that they preserved their contentions by objecting to the district court's proposed instructions to the jury. The defendants point to the objections they lodged to the definition of "corruptly." The defendants argued to the district court that "[i]n light of the evidence that has developed," the jury instruction should have defined "corruptly" as "intent to receive a specific benefit in return for a payment. And incorporated in that is the intent of the specific quid pro quo required for bribery and under 201 Section 18, 201 concerning bribery under 18 U.S. Code Section 666." The defendants were referring to 18 U.S.C. § 201, regarding bribery of public officials, and were arguing that the same intent requirement for that offense is required under 18 U.S.C. § 666, the statute the defendants were charged with violating. During this colloquy with the court, Wong and Bohuchot also cited the Fourth Circuit's decision in *United States v. Jennings* for the proposition that "corrupt intent" is "the intent to

5

engage in 'some more or less specific quid pro quo.'"[8]   Wong and Bohuchot

reiterated similar objections to the definition of "corruptly" during subsequent

discussions with the district court.[9]   However, there was no discussion of the

evidence during the course of these objections.  There was no hint or suggestion

to the district court that the government had changed its theory of how the

defendants had violated 18 U.S.C. § 666 or that this had resulted in a

constructive amendment of the indictment.  Nor did either of the defendants

apprise the district court that the jury instructions would permit a conviction

based on a theory that was not contained in the indictment.  It was only to this

court, on appeal, that Wong and Bohuchot for the first time argued that the

indictment was constructively amended.

Prior to the Supreme Court's decision in *United States v. Olano*,[10] this

court had held that "[c]onstructive amendments are reversible *per se*."[11]  Our

post-*Olano* decisions, however, have concluded that plain error review applies

even if there has been a constructive amendment.  Although there is "tension

between plain error review and the 'automatic reversal' rule of *Mize*," it is clear

---

[8] 160 F.3d 1006, 1021 n.6 (4th Cir. 1998) (quoting *United States v. Arthur*, 544 F.2d 730, 734 (4th Cir. 1976)).

[9] Counsel for Bohuchot argued:

Your Honor, it ["corruptly"] does not have its ordinary and common meaning in this specific statute because this specific statute relates back to the 18 U.S. Code [201] a bribery statute for its language when it was adopted, and bribery requires the intent to effect and [sic] exchange of money for a specific official action and that is – for a short term quid pro quo requirement and 666, while it doesn't define it and that is the issue other circuits have held that a specific quid pro quo is required and the instructions relating back to – 18 U.S. Code [201] are required.  That is why just the common usage definition won't apply here or wouldn't adequately instruct the jury, Your Honor, or at least that is my position.

[10] 507 U.S. 725 (1993).

[11] *United States v. Chandler*, 858 F.2d 254, 256 (5th Cir. 1988).

in this Circuit that we have "reconciled [that tension] in favor of plain error review."[12]  Our inquiry is therefore whether there was plain error in the district court proceedings.[13]

As the Supreme Court has often noted, there are four prongs to a plain error analysis.[14]  These are "(1) there was an error or defect, a 'deviation from a legal rule—that has not been intentionally relinquished or abandoned'; (2) 'the legal error must be clear or obvious, rather than subject to reasonable dispute'; (3) the error affected the defendant's substantial rights, 'which in the ordinary case means he must demonstrate that it affected the outcome of the district court proceedings'; and (4) when these three elements are present, a court may exercise its discretion to correct the error, although this discretion 'ought to be exercised only if the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'"[15]  We conclude that it is at least debatable whether there was clearly or obviously a constructive amendment of the indictment, but that in any event, neither the third nor fourth prongs of plain error review is satisfied in this case.

The defendants acknowledge that the government's presentation of its case during opening statements remained within the confines of the indictment.  It

---

[12] *United States v. Dixon*, 273 F.3d 636, 639 n.1 (5th Cir. 2001) (quoting *United States v. Daniels*, 252 F.3d 411, 414 n.8 (5th Cir. 2001)); *see also United States v. Scher*, 601 F.3d 408, 411 (5th Cir. 2010); *United States v. Broadnax*, 601 F.3d 336, 340 (5th Cir. 2010); *United States v. Phillips*, 477 F.3d 215, 221 (5th Cir. 2007); *United States v. Reyes*, 102 F.3d 1361, 1365 (5th Cir. 1996).

[13] *See Dixon*, 273 F.3d at 639 (holding that the contention that the indictment had been constructively amended would be reviewed for plain error when there was no objection in the district court).

[14] *See, e.g.*, *Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009); *Olano*, 507 U.S. at 732-36.

[15] *United States v. John*, 597 F.3d 263, 283 n.91 (5th Cir. 2010) (quoting *Puckett*, 129 S. Ct. at 1429) (internal quotation marks omitted).

was during the presentation of government witnesses, the defendants claim, that the government began to assert other theories upon which the jury could find Wong and Bohuchot guilty.  The record, however, reflects that it was the defendants who first broached many of the facts that they now say should not have been before the jury.

In opening statements, the defendants argued that Bohuchot did not have the authority to bind DISD to any contracts and was not a member of either the DISD board or the committees selected to evaluate the bids on the two contracts. The defendants also asserted in opening statements that Bohuchot did not attempt to influence the evaluation committees.  The defendants continued to develop this strategy in cross-examining government witnesses.  For example, the government did not go beyond the facts set forth in the indictment in the direct examination of Larry Groppel, who was the deputy superintendent for business services at DISD when the contracts were awarded.  It was on cross-examination that the defendants elicited that the bids were opened by the purchasing department, that that department chose who would be on the committees scoring the bids, and that Bohuchot's department "left the evaluation committees alone" to do their work.

Similarly, on cross-examination of another witness, Roland Taylor, the defendants emphasized that Bohuchot was not a member of the bid evaluation committees, and that there were no records that he was present when these committees were doing their work.  On redirect of this witness, the government elicited that it was probably Bohuchot who determined how many points would be awarded in each category of scoring that was to be used in evaluating the bids and that Bohuchot chose the evaluation committee members.

In its direct examination of other witnesses, the government hewed to the indictment, developing in some detail how Wong and those with whom he associated were able to use nonpublic information to structure a winning bid.

For example, through Blair Thomas, the director of sales and operations for MSE, the government offered evidence that, long before the RFP for the Seats Management contract was made public, Bohuchot gave Thomas information that "value adds," meaning things of value to DISD outside the specifications of the RFP, would be important and how the "value adds" would be weighted in the evaluation process.  Bohuchot also discussed financing with Thomas, and Thomas knew well in advance of the RFP's dissemination that bidding firms would be required to have a net worth of at least $1 billion.  MSE did not meet that requirement, and receipt of this early information gave MSE time to associate with another company that had the requisite financial strength.  In a meeting that occurred in Key West, days before the RFP was publicly released, Thomas was given a copy of the RFP by Bohuchot.  Thomas handed it to Wong. Wong then told Thomas that Wong and Bohuchot needed to meet and that Thomas did not need to be present.

The government did not go beyond the facts set forth in the indictment during its initial closing argument to the jury.  Counsel for Bohuchot made numerous points in response and briefly argued to the jury that his client did not receive the bids for the two contracts and that Taylor chaired the bid selection committee, of which Bohuchot was not a member.  He noted that Bohuchot did not participate in the scoring of the bids and did not try to influence that process. Wong's counsel similarly argued in closing that Bohuchot did not have the power or the authority to award contracts to Wong and that the bids for both contracts went through evaluation committees.  In response, in its closing argument, the government asserted that Bohuchot had discussions with MSE representatives over the course of the year before the RFP for the Seats Management contract was publicly available.  The government did, however, make other points that were not part of the indictment, including that Bohuchot was involved in the evaluation process, had contact with the DISD board, and that the board would

9

naturally rely on him.  The government argued that the members of the evaluation team reported to Bohuchot and "when you know your boss wants something, what are you going to do?  You are going to try to make your boss happy."  The government then emphasized that the DISD board would have relied on the head of the technology department, Bohuchot, in signing the Seats Management contract, and that Bohuchot's signature appeared on a document recommending to the board that it accept the contract that would handsomely compensate MSE.  Later in the argument, the government asserted, "[t]hen you have DISD.  What did he [Bohuchot] control here? . . . He controlled the board of trustees.  He controlled his department employees.  And he controlled most importantly the information flow.  That is a lot of control."  With regard to the E-rate contract, the government argued that Bohuchot set the scoring matrix that was used by the evaluation committee to score each bid.   These were not facts alleged in the indictment.

We will assume, without deciding, that there was a constructive amendment of the indictment.  We cannot conclude, however, that any such error affected the defendants' substantial rights, that is, that it affected the outcome of the district court proceedings.[16]  The evidence that Wong bribed Bohuchot was strong, notwithstanding the defendants' point that the government's own witnesses testified that it was common practice for school districts to share information with vendors regarding forthcoming RFPs, and the defendants' argument that the government failed to call any of MSE's business competitors to establish the allegation that Wong received "inside" information unavailable to other companies.  Two separate witnesses for the government, Thomas and Coleman, testified that Bohuchot brought a draft of the Seats Management RFP with him to a secret meeting with Wong that took place in

---

[16] *See Olano*, 507 U.S. at 734.

Key West, Florida days before the official release of the RFP. More importantly, Garrett Goeters, an HP account executive, testified to having multiple and specific early conversations with Bohuchot, and admitted that the information provided by Bohuchot helped HP/MSE prepare their bid for the Seats Management contract because they had more time and were thus better prepared than competitors. The jury heard not only the facts recounted earlier in this opinion that were included within the indictment, it also heard detailed testimony that supported extensive allegations in the indictment that after the Seats Management contract was signed by DISD, Wong provided to Bohuchot the expansive use of and control over two yachts in Florida. Wong not only paid, through a shell entity, for the purchase of the yachts, but he paid more than $300,000 for yacht-related expenses. Wong provided frequent-flyer miles to Bohuchot and his family to travel to the yachts. The yachts' captain, Dan Tingley, testified that Bohuchot controlled and used these high-dollar vessels as his personal possessions and that Wong told Tingley on one occasion when he complained about Bohuchot's operating the boat unsafely, that without Bohuchot, "there would be no boat." The evidence also established that Wong funneled substantial sums of money to Bohuchot's son-in-law and attempted to conceal these payments through a series of holding companies. Other things of value, such as expensive tickets to sporting events and expensive golf outings, were bestowed upon Bohuchot by Wong. It is improbable that the jury would have concluded that Wong and Bohuchot were innocent if only the evidence of which the defendants now complain had been excluded.

In any event, we decline to exercise our discretion to correct any error that may exist regarding a constructive amendment of the indictment. Any such error did not seriously affect the fairness, integrity, or public reputation of the

No. 08-11090

judicial proceedings.[17]  Wong and Bohuchot were not surprised by the evidence they now challenge.  The defendants, in large measure, raised these areas of inquiry defensively, and the government responded.  There is no contention that the defendants were unable to meet the government's evidence.  And, as noted, the evidence of guilt was very substantial.  Accordingly, we will not reverse the convictions on the basis of a constructive amendment of the indictment.

## III

Wong and Bohuchot argue that they are entitled to rendition of judgment in their favor, contending that the evidence was insufficient to prove the charges for which they were indicted.  Our review is to determine if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[18]

With regard to the Seats Management contract, we have set forth above the considerable evidence that supports the jury's findings of guilt.  The evidence was sufficient to support the convictions that pertain to the Seats Management contract.

With regard to the E-rate contract, the government concedes that it presented no direct evidence that Bohuchot assisted Wong in submitting the successful bid or otherwise influencing the contracting process.  However, as set forth above, there was considerable evidence that Wong provided money and other things of considerable value to Bohuchot after the E-rate contract was awarded.  A rational juror could infer from this circumstantial evidence and the evidence regarding the Seats Management contract that Bohuchot accepted or solicited the remuneration from Wong as part of an ongoing scheme as alleged

---

[17] *See id*. at 736.

[18] *United States v. Ekanem*, 555 F.3d 172, 174 (5th Cir. 2009) (citation omitted).

12

No. 08-11090

in the indictment.

## IV

Wong asserts that the prosecutor impermissibly commented on Wong's decision to invoke his Fifth Amendment right not to testify at trial. Generally, we review such a contention de novo.[19] Because Wong failed to object to these comments at trial, however, this claim is reviewed for plain error.[20]

A prosecutor is prohibited from commenting directly or indirectly on a defendant's failure to testify.[21] Ordinarily, "[t]he test for determining whether the prosecutor's remarks were constitutionally impermissible is: '(1) whether the prosecutor's manifest intent was to comment on the defendant's silence or (2) whether the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence.'"[22] The prosecutor's intent is not manifest if there is some other, equally plausible explanation for the remark.[23] Both inquiries are properly conducted by reviewing the challenged remarks in context.[24]

During closing arguments, the prosecutor remarked:

---

[19] *United States v. Martinez*, 151 F.3d 384, 392 (5th Cir. 1998).

[20] *United States v. Zanabria*, 74 F.3d 590, 593 (5th Cir. 1996) ("[Where] [t]here was no timely objection . . . our review must be for plain error, *i.e.*, an error which is clear and which affects substantial rights.") (citing *Olano*, 507 U.S. 725).

[21] *Griffin v. California*, 380 U.S. 609, 615 (1965); *United States v. Montoya-Ortiz*, 7 F.3d 1171, 1178 (5th Cir. 1993) ("The Fifth Amendment prohibits a prosecutor from commenting directly or indirectly on a defendant's failure to testify.").

[22] *United States v. Grosz*, 76 F.3d 1318, 1326 (5th Cir. 1996) (quoting *United States v. Collins*, 972 F.2d 1385, 1406 (5th Cir.1992)).

[23] *Id.*; *see also United States v. Green*, 324 F.3d 375, 382 (5th Cir. 2003) ("If there is an equally plausible explanation for the remark, the prosecutor's intent is not manifest.") (internal quotations omitted) (citing *Grosz*, 76 F.3d at 1326).

[24] *United States v. Jones*, 648 F.2d 215, 218 (5th Cir. Unit B June 1981) (per curiam).

13

No. 08-11090

> What else is happening during this time period? May, 2002,
> this trip to Key West we know Mr. Bohuchot was on it.  Mr.
> Coleman was on it.  Mr. Wong was on it, and Blair Thomas
> was on it.  The four men two of which talked to you about
> the RFP being there and the other two sitting here.

Wong contends that there is no reasonable way to interpret the prosecution's argument other than: "Our witnesses testified;  Mr. Wong did not."  The government responds that the prosecutor could not possibly have been referring to Wong's failure to testify because the reference to "the other two sitting here" was to Wong and Bohuchot, and Bohuchot testified.  The prosecutor was arguing, the government contends, that two of the four men in the van in Florida testified that the RFP for the Seats Management contract was displayed in the van and the other two deny this occurred (in the case of Wong, through arguments of his counsel, and in Bohuchot's case, through his own testimony as well as arguments of counsel).  We agree with the government that, in context, this is a plausible explanation of the prosecutor's statement.

Even if the prosecutor's comments were improper, they were not sufficiently prejudicial to "cast serious doubt on the correctness of the jury's verdict."[25]  Nor did they affect Wong's substantial rights.  The district court cautioned the jury through instructions that "no inference or conclusion may be drawn from a defendant's decision not to testify."  As already noted, the evidence of Wong's guilt was substantial.

## V

Reversal and remand is required, Wong and Bohuchot assert, because the district court's jury instructions lowered the *mens rea* for conspiracy to commit money laundering.  The indictment charged the defendants with violating 18

---

[25] *See United States v. Virgen-Moreno*, 265 F.3d 276, 290 (5th Cir. 2001) (citation omitted).

No. 08-11090

U.S.C. § 1956(h).  Section 1956(h) prohibits conspiracies to launder money, as defined by § 1956(a).[26]  The district court's charge to the jury stated, in pertinent part:

> Title 18 U.S.C. § 1956(h) makes it a crime for anyone to conspire or agree with someone else to do something that, if actually carried out, would be a violation of 18 U.S.C. § 1956(a), which prohibits knowingly using the proceeds of certain illegal activity to promote the carrying on of certain illegal activity or conceal or disguise the nature, location, source, ownership, or control of the proceeds. Count 10 of the Indictment charges Defendants with conspiracy to launder monetary instruments. You are directed to read this count as set forth in the Indictment.
>
> * * *
>
> For you to find Defendants Bohuchot and Wong guilty of the crime of conspiracy to launder monetary instruments as charged in count 10, you must be convinced that the Government has proved each of the following beyond a reasonable doubt:

---

[26] 18 U.S.C. § 1956(a) provides

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity–

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

. . .

(B) knowing that the transaction is designed in whole or in part–

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity;

. . .

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both. For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.

No. 08-11090

*First*:     That two or more persons, in some way or manner, came to a mutual understanding to try to accomplish a common and unlawful plan to violate Title 18 U.S.C. § 1956(a) as charged in the Indictment; and

*Second*:    That the defendant, knowing the unlawful purpose of the plan, willfully joined in it, that is, with the intent to further the unlawful purpose.

Wong and Bohuchot assert that although the indictment correctly alleged the required *mens rea*, the jury instructions can be read in two erroneous ways. They argue that the instruction required that the defendants knowingly used funds but that it had no *mens rea* requirement at all regarding promoting or concealing.  Alternatively, they argue that the instruction required that the defendants knowingly used funds and knowingly promoted or concealed.  This, they say, lowered the *mens rea* from "intentional" to "knowing."

The defendants did not object in the district court on either of these grounds.  Our review, therefore, is for plain error.[27]  We will assume, without deciding, that the jury instructions did not require the jury to find all the necessary elements to convict the defendants of conspiracy to commit money laundering.  Even were we reviewing for error, rather than plain error, the harmless error rule of the Supreme Court's decision in *Chapman v. California*[28] would apply when, as here, an element of an offense is omitted or misdescribed in a jury charge.[29]  The question we would ask, had error been preserved, is "whether it appears 'beyond a reasonable doubt that the error complained of did

---

[27] FED. R. CIV. P. 51(d)(2); *United States v. Clayton*, 172 F.3d 347, 351 (5th Cir. 1999).

[28] 386 U.S. 18, 23-24 (1967).

[29] *See Neder v. United States*, 527 U.S. 1, 4 (1999).

16

not contribute to the verdict obtained.'"[30]   Error would be harmless if no jury could reasonably find that Wong and Bohuchot did not agree to transfer funds with the intent to promote the carrying on of specified unlawful activity and did not agree to transfer funds knowing that the transfer was designed to conceal the nature, location, source, ownership or control of proceeds of specified unlawful activity.

The jury found that there was an agreement regarding unlawful proceeds. In light of that finding and the considerable and strong evidence of the intentional and knowing nature of Wong and Bohuchot's agreement and conduct, no jury could reasonably fail to make the requisite findings regarding the applicable *mens rea*.  There was evidence that Wong funneled proceeds from MSE's participation in the DISD contracts to a company, Statewide Marketing, owned by the same three individuals who owned MSE.  Statewide Marketing owned the yachts and paid for all the bills associated with them.  There was also evidence that Wong hired Bohuchot's son-in-law, who received two paychecks. Bohuchot told his son-in-law that he would continue to receive checks even if his employment with MSE ended, and Bohuchot instructed his son-in-law to pay part of the proceeds from his second check each month to Bohuchot.  These payments to Bohuchot amounted to $50,000 per year.  We will not lengthen this opinion by detailing all of the additional evidence of money laundering.  Suffice it to say that the jury believed that there was an agreement to launder money and there was overwhelming evidence to support that finding.  It follows that there was no plain error.

## VI

Bohuchot and Wong further contend that the district court committed

---

[30] *Id*. at 15 (quoting *Chapman*, 386 U.S. at 24).

error in calculating the "value" of the bribe for sentencing purposes under U.S.S.G. § 2C1.1(b)(2), which provides for increasing the offense level according to the value of the bribe.[31]  Specifically, the Defendants argue that the district court overestimated the benefit of the two yachts provided by MSE for Bohuchot's personal use.  Defendants allege that the court committed error by equating the cost of actual ownership of the vessels with Bohuchot's frequent use.  This resulted in the court attributing to Bohuchot 80% and 90%, respectively, of MSE's total cost of ownership for the two yachts—$667,669 in total.  Defendants contend this calculation vastly overestimated the "value" of the bribe, which the court found totaled $946,942.  Defendants argue that because Bohuchot did not own the yachts, but merely used them (approximately 40 times over a two-and-a-half-year period on trips that lasted anywhere from a day to several weeks at a time), the proper methodology would have been to calculate the cost of renting the boats for this period.  Basing the calculations on the market value of yachts that Bohuchot did not actually own, defendants insist, resulted in a gross inflation of the actual "value" Bohuchot enjoyed.  The defendants raised these arguments in the district court.

"The amount of benefit to be received is a fact finding issue that is reviewed for clear error."[32]  The district court need not determine the value of the benefit with precision.[33]  Moreover, when "determining the amount of benefit to

---

[31] *See* U.S.S.G. § 2C1.1(b)(2) ("If the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $5,000, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.")

[32] *United States v. Griffin*, 324 F.3d 330, 365 (5th Cir. 2003); *see also United States v. Valladares*, 544 F.3d 1257, 1266 (11th Cir. 2008) (per curiam) (same).

[33] *Griffin*, 324 F.3d at 366 (citing *United States v. Landers*, 68 F.3d 882, 884 n.2 (5th Cir. 1995)).

be received, courts may consider the expected benefits, not only the actual benefits received."[34]

Nevertheless, we conclude that because Bohuchot did not have the legal right to sell or otherwise transfer any interest in the boats in question, Bohuchot could not be found to enjoy an "ownership" interest for the purposes of calculating the amount of a benefit received under U.S.S.G. § 2C1.1(b)(2). Bohuchot did not receive the market value of the yachts, only the value attributable to his use of the yachts. However, the district court's use of the yachts' market value in calculating Bohuchot's sentence was harmless.

The district court applied a 14-level increase under section 2B1.1(b)(1) of the Sentencing Guidelines. That increase applies when the value of the bribe is greater than $400,000 but less than $1,000,000. The district court estimated that the value of payments and benefits to Bohochut unrelated to the yachts was $278,243. Accordingly, if the value of the use of the boats was more than $121,757, the 14-level enhancement would still have applied. The defendants contend that the value of the use of the yachts was from $1500 to $2500 per day for the first yacht and $2500 to $3500 per day for the second. If Bohuchot used the less expensive yacht for approximately 49 days at a value of $2500 per day, the value to him would have exceeded $121,757, and there was evidence that he used the yachts for more than 49 days. The defendants have failed to establish harmful error in the district court's application of the 14-level increase.

## VII

With regard to sentencing, the defendants also assert that the district court erred in finding more than one bribe and adding two levels under U.S.S.G. § 2C1.1(b)(1). The district court reasoned that the counts of conviction

---

[34] *Id.*

No. 08-11090

support finding more than one bribe.  There was evidence that proceeds MSE received from both the Seats Management contract and the E-Rate contract were shared with Bohuchot.  The district court's application of the two-level increase was not clearly erroneous.

* * *

The convictions and sentences are AFFIRMED.