**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 98-11196

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BLAS VIRGEN-MORENO, also known as Quintana;
ARNULFO ANGUIANO-LLERENAS;
DAVID MADRIGAL-TRUJILLO; MARCO ANTONIO
VIRGEN-MORENO, also known as Paco,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Texas, Dallas

September 5, 2001

Before DAVIS, WIENER, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Blas Virgen-Moreno ("Blas"), Arnulfo Anguiano-Llerenas ("Anguiano"), David Madrigal-Trujillo ("Madrigal"), and Marco Antonio Virgen-Moreno ("Marco") (collectively, "the defendants" or "the appellants") each appeals his conviction and sentence for conspiracy to distribute methamphetamine. Blas also appeals his conviction and sentence for money laundering. For the following reason, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

The appellants were among twenty-eight persons indicted on drug-related charges as a result of an eight-month investigation by the Drug Enforcement Agency ("DEA") in Dallas, Texas, and in Los Angeles, California. On December 2, 1997, Blas, Anguiano, Madrigal, Marco, and others were charged with conspiracy to distribute methamphetamine. Marco and others were charged with conspiracy to distribute cocaine. On April 8, 1998, a superseding indictment was returned again charging Blas, Anguiano, Madrigal, Marco, and others with conspiracy to distribute methamphetamine. Marco and others were again charged with conspiracy to distribute cocaine.[1] Blas and others were charged with conspiracy to launder money.

The facts giving rise to the defendants' indictments and convictions are as follows. Daniel Virgen ("Daniel"), who is not a defendant in this case, was a Dallas drug wholesaler who trafficked primarily in pound quantities of methamphetamine. He had various suppliers in Mexico and California, including his Los Angeles-based cousin, Anguiano.

The DEA first became aware of Daniel when his name was referenced by suspects in another narcotics case prompting the DEA to initiate investigation focusing on the Virgen family. Telephone numbers subscribed to by Daniel and Blas came under scrutiny. DEA agents initially obtained a Dallas court order to monitor Daniel's cell phone. The agents immediately began intercepting drug-related conversations between Daniel in Dallas and his suppliers in Los Angeles. They contacted Los Angeles agents and asked them to join the investigation.

---

[1]The charges against Marco relating to cocaine distribution were later dismissed.

Next, DEA agents monitored Blas's telephone, which was primarily used by his brother, Humberto Virgen ("Humberto"), Daniel's cousin. Eventually, the agents targeted and monitored other telephones. Ultimately, they monitored seven telephones and intercepted 15,000 calls, approximately 3,800 of which were drug-related. The participants in the intercepted telephone conversations, who included drug sellers and buyers, used code words when they discussed drug deals or other illicit activity. The government introduced the transcripts of many of these coded conversations at trial.

Through the intercepted telephone conversations and surveillance, DEA agents determined that Daniel headed the Virgen organization, which was highly structured. Daniel was assisted by Humberto, Marco, and Blas, all of whom are brothers. Humberto was second in command, behind Daniel. Marco and Blas took orders from Daniel and Humberto, and they delivered drugs and drug money. The Virgen organization had numerous customers who in turn had their own customers. Thus, according to the government, the organization was elaborate and extremely profitable.

Also through the intercepted telephone calls and surveillance, DEA agents discovered that Madrigal, like Daniel, was a drug wholesaler. He received his drug supply from Anguiano. Daniel learned of Madrigal's operations when Anguiano suggested that Daniel use Madrigal as an alternate source when drug supplies became scarce. Daniel purchased methamphetamine directly from Madrigal. Daniel and Madrigal transported drugs and money between California and Texas, sometimes sharing the same transporters. The drugs and money were typically transported in vehicles which had hidden compartments. Conspiracy-connected transporters possessing drugs and money were apprehended by the authorities on June 19, 1997, and again on August 1, 1997.

The eight-month investigation by the DEA culminated with the searches of twenty locations. These searches resulted in the seizure of methamphetamine and other drugs at several of the locations. The investigation produced indictments against twenty-eight individuals, including these defendants. The government presented a substantial amount of evidence in this case, including numerous wiretap tapes and the corresponding transcripts, various seized items, and testimony from DEA agents and local police officers involved in the investigation and arrests of the defendants. The jury convicted the defendants, and the district court sentenced them as follows: Blas, 260 months of imprisonment for count 1, the drug conspiracy charge, and 240 months of imprisonment for count 3, the money laundering conspiracy charge, to run concurrently; Anguiano, 420 months of imprisonment; Madrigal, 420 months of imprisonment; and Marco, 240 months of imprisonment. Each of the defendants now appeals his conviction and sentence.

## DISCUSSION

I.     Sufficiency of the Evidence

Blas, Marco, and Madrigal argue that the evidence was insufficient to support their convictions. As they each moved for judgment of acquittal at the close of the government's case, the standard of review in assessing their challenge to the sufficiency of the evidence is "whether, considering all the evidence in the light most favorable to the verdict, a reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt." United States v. Mendoza, 226 F.3d 340, 343 (5th Cir. 2000).

4

In a prosecution for drug conspiracy under 21 U.S.C. § 841,[2] the government must prove beyond a reasonable doubt: "(1) the existence of an agreement between two or more persons to violate narcotics law; (2) the defendant's knowledge of the agreement; and (3) the defendant's voluntary participation in the agreement." United States v. Gonzalez, 76 F.3d 1339, 1346 (5th Cir. 1996). To prove conspiracy to launder money under 18 U.S.C. § 1956(h), the government must establish "(1) that there was an agreement between two or more persons to commit money laundering, and (2) that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose." United States v. Meshack, 225 F.3d 556, 573-74 (5th Cir. 2000); see also United States v. Threadgill, 172 F.3d 357, 366 (5th Cir. 1999).

"Direct evidence of a conspiracy is unnecessary; each element may be inferred from circumstantial evidence . . . . An agreement may be inferred from a 'concert of action.'" United States v. Casilla, 20 F.3d 600, 603 (5th Cir. 1994) (quoting United States v. Cardenas, 9 F.3d 1139, 1157 (5th Cir. 1993)). Once the government presents evidence of a conspiracy, it only needs to produce slight evidence to connect an individual to the conspiracy. Id. Additionally, "[p]resence and association with other members of a conspiracy, along with other evidence, may be relied upon to find a conspiracy." Id.

After carefully reviewing the record in this case, we find that there was more than sufficient evidence on which to convict each of the defendants of his respective charge or charges. As stated above, the government's evidence included tapes of numerous wiretaps and the corresponding

---

[2]21 U.S.C. § 846, the attempt and conspiracy statute, provides: "Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." Thus, the defendants were actually convicted under 21 U.S.C. § 846.

transcripts,[3] various seized items, and testimony from DEA agents and local police officers involved in the investigation and arrests of the defendants. The following is a summary of the evidence that the government presented as to Blas, Marco, and Madrigal.

     A.     Evidence as to Blas

     1.     Conspiracy to Distribute Methamphetamine

While intercepting conversations in another case, DEA agents discovered that telephone numbers subscribed to by Blas and Daniel were being used to facilitate drug trafficking. The DEA then initiated their investigation into the Virgen drug operation. It discovered that Blas took orders from Daniel, the organization's leader. Some of Blas's duties included making wire transfers, cash deposits, and drug deliveries to customers.

The government's evidence as to Blas included specific incidents in which Blas actively participated in the drug operation. On one occasion, after a customer had been arrested subsequent to receiving drugs from Daniel and Marco, Blas and Daniel discussed the arrest. On another occasion, Blas picked up money and delivered methamphetamine to a customer. Humberto and the customer discussed the delivery in a telephone call. Also, once when Daniel and Humberto went out of town, they left Blas and Marco to take care of customers, handle money, "pay bills" and ensure that drug proceeds were wired.

---

[3]The taped conversations are mostly in Spanish. Therefore, the government provided transcripts of the tapes translated into English. The defendants do not challenge the accuracy of the translations or the transcripts.

Furthermore, agents searched Blas's house and found several incriminating items. They seized a triple beam weight scale, "baggies," money orders, and Western Union Money Grams. Blas's wallet, which agents seized, contained telephone numbers of drug customers, drug suppliers, Madrigal's pager and telephone numbers, and numbers associated with Daniel. Also, though during his post-arrest interview Blas denied transporting drugs for Daniel, he admitted that he had transported and picked up money for Daniel several times.

### 2. Money Laundering

The government presented evidence regarding the money laundering charges through Agent Paul Shanks ("Agent Shanks") from the Internal Revenue Service ("IRS"). Agent Shanks established, through summary charts, that the Virgen organization sent money to California and Mexico by courier and wire transfers. He also analyzed Blas's expenditures and fund sources for 1997 and documented which expenditures Blas used to promote drug trafficking.

The government presented evidence of wire transfers attributable to Blas and corroborated it with intercepted telephone calls. Furthermore, there were coded telephone conversations in which Blas discussed transporting money related to drug sales. Also, Blas used $5,000 in drug proceeds to purchase a truck for Daniel, who did not have legitimate employment. Moreover, Blas made bank deposits for Daniel, totaling $13,900.

### B. Evidence as to Madrigal

7

Through the testimony of FBI Special Agent Mike Elsey ("Agent Elsey"), the government established that Madrigal was a Dallas drug wholesaler on the same level or classification as Daniel. He obtained drugs from Anguiano and sold them in pound quantities.

In May 1997, the government intercepted telephone conversations indicating that Anguiano was supplying drugs to Madrigal. In a series of coded telephone conversations between Anguiano and Daniel, Anguiano suggested that Daniel use Madrigal as an alternate source of methamphetamine. On one occasion, in June 1997, when Daniel requested more methamphetamine than Anguiano could supply, Anguiano suggested that Daniel contact Madrigal, who had just received a shipment. Heeding that advice, Daniel called Madrigal.

In another intercepted telephone conversation, Daniel contacted Madrigal and asked him to "bring five separately." In a coded conversation, which took place after Daniel and Madrigal met, Daniel explained to Anguiano that Madrigal had given him only ten pounds of methamphetamine, not the fifteen pounds that he needed.

The government also established that Daniel and Madrigal used the same persons to transport money and drugs to and from California. The government offered testimony that on June 19, 1997, police arrested two unindicted co-conspirators and relatives of Madrigal in Needles, California, after a routine traffic stop. The two men were transporting $53,900, which was payment for methamphetamine. Police found Daniel's payment of $25,000 in a nylon bag. The remaining $28,900 was bundled separately and bore the initials "D.T." After their arrest, the two men placed collect calls to Madrigal's residence. Also after this arrest, additional telephone calls between Madrigal and Anguiano were intercepted. Money seized from the two men was bundled in an identical fashion to $30,000 seized from Madrigal's residence on December 4, 1997.

8

Other evidence implicated Madrigal in illicit drug activity. For example, surveillance linked him to the conspiracy. When Anguiano came to Dallas, DEA agents observed him going into Madrigal's house and picking up a suitcase. Additionally, searches revealed that other alleged co-conspirators had Madrigal's telephone number in their possession.

C.     Evidence as to Marco

The government presented evidence that Marco was a "worker" who took orders from Daniel and Humberto. When Daniel and Humberto left town, Marco and Blas ran the organization.

The government presented evidence of specific instances in which Marco engaged in illicit drug activity. For example, on June 8, 1997, he and Daniel delivered three pounds of methamphetamine to a customer, Benito Jiminez ("Jiminez"). Jiminez was stopped and arrested shortly thereafter for drug possession. Two days later, Marco called Daniel and discussed the arrest. Also, on September 17, 1997, Marco called Blas and asked him to bring "letters," which the government established to be a coded reference to drug activity. Blas then carried a white cooler to the house where the two were to meet.

There was also testimony linking Marco to wire transfers of money sent to further drug activity. Furthermore, authorities found Western Union receipts at his house during a search. Also found during the search were Marco's "drug notes" and "drug ledgers," which reflected drugs going out and money coming in. The search also produced $100 bills placed in rubber bands and totaling $2000.

The above summary of the evidence indicates that there was an elaborate drug organization in which each of the defendants in this case had defined roles and actively participated. We find that

9

the evidence was more than sufficient to convict each of them on his respective charge or charges.

II.      Dismissal of Juror Michelle Collins and Substitution of Alternate Juror John Sleeth

On Friday, July 17, 1998, at approximately 11:30 a.m., the jury retired to deliberate. Approximately fifteen minutes later, Juror Michelle Collins ("Juror Collins" or "Collins") sent a note to the district judge. In the note, Collins requested to be excused for the remainder of the day because she was having difficulty concentrating as a result of three deaths of family members and friends during the week. She indicated that she would be willing to return on the following Monday. By the time she sent the note to the judge, the jury had already selected a foreman. At approximately 11:45 a.m., the jury was released to go to lunch and instructed to return by 12:45 p.m.

After conferring with the attorneys, the district judge excused Collins and appointed an alternate to replace her. The judge made the substitution although he had excused the alternate jurors before the jury's deliberations began. The judge discovered that one of the jurors, John Sleeth ("Juror Sleeth" or "Sleeth"), was still in the courthouse and arranged for him to be brought back to the courtroom. When Sleeth arrived in the courtroom, the judge asked him where he had gone after being dismissed. He stated that he had gone outside and walked up the street and then returned to the courthouse to obtain a certificate. The judge also asked Sleeth if he had discussed the case with anyone or if he had read anything. He responded that he had not. The judge instructed Sleeth to take a lunch break and return with the other jurors at 12:45p.m. The judge did not, after impaneling Sleeth, address the other jurors and instruct them to start their deliberations anew. The jurors, including Sleeth, began deliberating at 12:46 p.m.

The record does not reflect precisely when the jurors ended their deliberations and notified the judge that they had reached a verdict. However, the judge and the jury returned to the courtroom

10

at 4:05 p.m., and the foreperson then read the verdict. Because the judge instructed counsel to remain no more than ten to fifteen minutes distance away from the courtroom and there is no indication that there was a long delay between the time the deliberations ended and the time the judge and the jury returned to the courtroom, the deliberations in all likelihood ended between 3:30 p.m. and 4:00 p.m. Thus, the jury deliberated for nearly three hours or more after the substitution of Juror Sleeth, but for no more than fifteen minutes before that, including election of the foreperson.

A.      The District Court's Dismissal of Juror Collins

Blas argues that the district court erred in dismissing Juror Collins. He claims that the district court had no factual support for its ruling. The government argues that the district court's decision to dismiss Collins was well supported based on her own request to be excused and the reasons given therefor.

A district court's decision to remove a juror is discretionary "whenever the judge becomes convinced that the juror's abilities to perform his duties become[ ] impaired." United States v. Leahy, 82 F.3d 624, 628 (5th Cir. 1996) (internal quotations omitted). Unless the court's removal of the juror has prejudiced the defendant, we will not disturb the court's decision. Id. Moreover, we will find prejudice only "if the juror was discharged without factual support or for a legally irrelevant reason." Id. The district court was not required to conduct an evidentiary hearing, and the scope of the court's investigation is within its sound discretion. United States v. Coleman, 997 F.2d 1101, 1106 (5th Cir. 1993).

After reviewing the note that Juror Collins sent to the district judge, we find no error in the judge's decision to dismiss her. Collins's note clearly indicated that she was unable to concentrate, and it provided the reasons for her inability. The reasons that Collins offered were sufficient factual

11

support for the district court's decision. Thus, we conclude that the district court was well within its discretion in dismissing Juror Collins.[4]

B.      The District Court's Substitution of Juror Sleeth

Blas also contends that the district court erred when it substituted an alternate juror in Collins's stead. Blas argues that after excusing Collins, the proper procedure would have been for the district court to allow the other eleven jurors to reach a verdict. The government asserts that there had been no jury deliberations up to the time the district judge substituted Sleeth in Collins's place and thus the substitution was permissible.

At the time of this trial, which was prior to the 1999 amendments to the Federal Rules of Criminal Procedure, instead of replacing a regular juror with an alternate after the jury had already begun deliberating, a district court was required to proceed with an eleven-person jury, under Fed. R. Crim. P. 23(b), or to declare a mistrial. See United States v. Quiroz-Cortez, 960 F.2d 418, 420 (5th Cir. 1992). Currently under the rules, the district court may choose to retain alternate jurors and replace regular jurors with the alternates, if necessary, upon following certain procedures.[5] Because

_____

[4]We reject Blas's argument that because Collins was one of the few African Americans on the jury, and thus probably would have been the "lone holdout," he was prejudiced by her dismissal. Blas has wholly failed to provide any support for this assertion.

[5]The version of Fed. R. Crim. P. 24(c) applicable at the time of trial provided: "Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties." FED. R. CRIM. P. 24(c) (West 1998). Thus, Rule 24(c)'s language disallowed the substitution of alternate jurors after the jury had begun deliberating. Quiroz-Cortez, 960 F.2d at 420.

The current version of Fed. R. Crim. P. 24(c) provides for the retention of alternate jurors and their replacement of regular jurors if the need arises. Specifically, Rule 24(c)(3) states:

When the jury retires to consider the verdict, the court in its discretion may retain the alternate jurors during deliberations. If the court decides to retain the alternate jurors,

this case was tried before the effective date of the 1999 amendments, our precedent pertaining to the previous version of Rule 24(c) is applicable in this case.

In Quiroz-Cortez, we stated that the rationale for the rule against substituting an alternate after deliberations have already begun is that the alternate may have been unable to equally participate with the other jurors because she did not have the benefit of the prior deliberations. 960 F.2d at 420. However, we also noted that if a district court errs in substituting an alternate after deliberations have begun, we apply a harmless error analysis, assessing whether the defendant was prejudiced by the late substitution. Id.; see also Huntress, 956 F.2d 1309,1316 (5th Cir. 1992) ("[W]e must determine whether [the defendant] suffered any prejudice from the district judge's recall of the alternate juror."); United States v. Phillips, 664 F.2d 971, 993 (5th Cir. 1981) ("The question before this Court is whether the appellants were prejudiced by the substitution of the alternate after the jury deliberations had begun."). Keeping in mind that the defendant was not entitled to a twelve-person jury, we determine whether the late substitution of an alternate juror prejudiced the defendant by considering, among other factors, the length of the jury's deliberations before and after the substitution, the district court's instruction to the alternate juror prior to dismissing her and thereafter, prior to impaneling her, the alternate juror's exposure to outside influences, and the district court's instructions to the jury upon the substitution to begin its deliberations anew. See Quiroz-Cortez, 960 F.2d at 420.

---

it shall ensure that they do not discuss the case with any other person unless and until they replace a regular juror during deliberations. If an alternate replaces a juror after deliberations have begun, the court shall instruct the jury to begin its deliberations anew.

Considering the relevant factors, we are unable to find prejudice in this case. Though the jury had begun deliberating, at most, it had deliberated for only fifteen minutes. In at least a portion of this fifteen minutes, the jurors selected a foreman, and Collins decided that she was unable to continue deliberating and drafted a note to the district court. Thus, we are convinced that any actual deliberations were minimal at best. The degree of deliberations prior to the substitution of Juror Sleeth is also minimal when compared to the length of the deliberations after the substitution, which was approximately three hours. Additionally, as Blas concedes, Juror Sleeth had not discussed the case with anyone, and thus he had not been tainted by any outside influences. The judge thoroughly questioned him on this point, and defense counsel appeared satisfied in this respect. We note, however, that the district judge did not expressly instruct the jurors to begin their deliberations anew. Blas claims that this failure was a fatal error.[6] Although such instructions are usually appropriate to avoid prejudice to the defendant, see Phillips, 664 F.2d at 995-96, we do not find that the judge's failure to give them here prejudiced Blas. We stated in Phillips that "[t]he most substantial concern about substitution of an alternate juror after deliberations have begun is that the alternate might be coerced by jury members who might have already formulated positions or viewpoints or opinions." 664 F.2d at 995. In this case, there can be little concern that Juror Sleeth was actually coerced by the other jurors, given the length of time that they deliberated before he joined them and the substantial length of deliberation time thereafter.

In Quiroz-Cortez, though the judge instructed the jurors to begin their deliberations anew, they had been deliberating for forty-five minutes prior to the substitution of an alternate, and they only

---

[6]Our review of the record reveals that neither Blas nor any other defendant asked the judge to instruct the jury to begin its deliberations anew.

14

deliberated for one and one half hour thereafter. 960 F.2d at 419-21. Still, we found no prejudice. Id. In Huntress, the jury had deliberated for more than a day prior to the substitution and returned a verdict only three hours thereafter. 956 F.2d at 1311-12. Moreover, before being impaneled, the alternate juror admitted to having discussed the case with her employer after being dismissed. Id. at 1312. Nevertheless, we found that the substitution did not prejudice the defendant. Id. at 1316-17. Given the length of deliberations before and after the substitution in this case, the risk of prejudice is much less in this case, even without a begin-again instruction, than in Quiroz-Cortez and Huntress where jurors were instructed to begin their deliberations anew.

Accordingly, although we find that the district court erred in substituting Juror Sleeth in Juror Collins's place, such error did not result in prejudice to Blas.[7] The error, therefore, was harmless.

III.    Prosecutorial Comments

Blas argues that his due process rights were violated when the prosecutor made improper comments in her rebuttal on his failure to have witnesses testify regarding voice identification and his failure to have family members testify on other matters. He claims that the prosecutor's comments resulted in an impermissible shifting of the burden of proof. Also, he asserts that the prosecutor's comments were an impermissible comment on his failure to testify. The district court overruled an objection by Marco's attorney to the prosecutor's statements. Blas complains that the court's failure to give the jury an immediate curative instruction prejudiced him.

---

[7]We reject Blas's claim that the substitution of Juror Sleeth prejudiced him because Sleeth slept during the trial. Blas failed to object to Sleeth's substitution on this basis and has wholly failed to demonstrate plain error. See United States v. Fort, 248 F.3d 475, 478 (5th Cir. 2001) ("Issues that are not raised in the district court are reviewed for plain error.").

The government points out that, although Marco objected to the prosecutor's statement, Blas did not and thus plain error review is applicable. Also, the government asserts that the prosecutor's statements were made in response to defense arguments regarding the government's failure to offer voice analysis and did not shift the burden of proof. Even if the prosecutor's comment were impermissible, the government asserts that any error was harmless.

Counsel is afforded much latitude during closing argument, and this Court gives deference to a district court's finding as to whether an argument is prejudicial or inflammatory. United States v. Palmer, 37 F.3d 1080, 1085 (5th Cir. 1994). In attempting to establish that a prosecutor's improper comments constitute reversible error, the criminal defendant bears a substantial burden. United States v. Diaz-Carreon, 915 F.2d 951, 956 (5th Cir. 1990). We do not lightly make the decision to overturn a criminal conviction on the basis of a prosecutor's remarks alone. United States v. Iredia, 866 F.2d 114, 117 (5th Cir. 1989). "The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." Id. In determining whether to reverse a defendant's conviction on the basis of improper prosecutorial argument, we consider three factors: "(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction." Palmer, 37 F.3d at 1085. (citing United States v. Casel, 995 F.2d 1299, 1308 (5th Cir. 1993)). We test the magnitude of the prejudicial effect of the prosecutor's remarks by considering them in the context of the trial and attempting to ascertain their intended effect. Id. It is well-settled that it is impermissible to draw any inference from a party's failure to call witnesses that were equally available to both sides. Iredia, 866 F.2d at 118.

16

We apply a two-tiered test to Blas's claim that the prosecutor improperly commented on his failure to testify.  See United States v. Grosz, 76 F.3d 1318, 1326 (5th Cir. 1996).  We must first determine whether the comments at issue were constitutionally impermissible.  Id.  If we conclude that they were, we then consider whether they were harmless beyond a reasonable doubt.  Id.  To determine whether the remarks were constitutionally impermissible, the test is: "'(1) whether the prosecutor's manifest intent was to comment on the defendant's silence or (2) whether the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence.'"  Id.  (quoting United States v. Collins, 972 F.2d 1385, 1406 (5th Cir. 1992)).  If there is an "equally plausible explanation for the remark," the prosecutor's intent is not manifest.  Id.  The "naturally and necessarily construed" prong is not established if the jury merely possibly or probably viewed the challenged remark as a comment on the defendant's silence.  Id.

During his closing argument, Blas's attorney stated,

We don't have to prove anything.  The Government has spent millions of dollars in this case and hundreds of man hours to prove it.  So they need to prove it.  There's no surveillance photos, there's no voice I.D., no voice identification of Blas Virgen Moreno on these tapes either.

So what we've got is his name is being used in wiretaps by other people saying, Blas did this, Blas did that.  We've got the phone numbers that were seized from his wallet with these people's names on it in a circle of this conspiracy, alleged conspiracy.  But since he's related to all these people, I'm not so sure that's all that conclusive.

Marco's attorney made similar comments in his closing:

Did they do any kind of voice analysis?  You've heard all the machines that they had.  They had tape wiretaps, and they had, you know, radio communication. They had the chemist down here who was doing his spectrograph analysis, or whatever he was talking about.  Did they do a voice analysis on any of those voices? I didn't hear one word of scientific testimony that could tell you, with all the experts and all the money and power that the Federal Government has, there's not one person who came down and said, "I analyzed these voices and this tape recording here was

17

made by the same persons that made this tape recording, X, Y and Z were all made by subject A.  B, C, D were made by Subject C."  There's none of that.

In her rebuttal, the prosecutor responded to Blas's and Marco's argument by stating to the jury:

If you don't like it because I didn't go out, after having these voices identified by agents that worked this case for a year, and we didn't go get somebody to listen to tapes and do spectrographs or whatever, then you blame me for that. But you don't hold it any more against this side than you do against that side for not bringing their own translations.  Why not bring the family in here?  Bring family in here to explain what these phone calls or toll records.  "Sure, I have a relative that lives in California, and that's why I called Arnulfo Anguiano's home three or four times a day, 20, 30, 40 times a month."  Bring a family member in here to say, "Well, Arnulfo Anguiano didn't live at that residence.  Or that David Madrigal didn't live at Carlson."  Bring somebody in here that knows.  There's family members, there's experts out there to come tell you that.

After reviewing the prosecutor's comments and the context in which they were stated, we conclude that the comments did not result in an impermissible shift of the burden of proof in this case. The comments were merely a response to defense counsel's arguments that the government failed to produce voice analyses on the wiretapped communications.

This case is similar to United States v. Palmer, 37 F.3d 1080 (5th Cir. 1994).  In Palmer, prior to closing arguments, the prosecutor asked the district court to prohibit defense counsel from referring to witnesses who did not testify.  Id. at 1086.  The district court ruled that if defense counsel made references to the government's failure to subpoena certain witnesses, the court would permit the government to state in turn that the defense did not subpoena them.  Id.  In closing argument, counsel referred to witnesses who had not been subpoenaed, and in rebuttal, the prosecutor informed the jury that the defense had the same subpoena power as the government and that the defense could have subpoenaed the witnesses to whom defense counsel had referred.  Id.  The district court

18

overruled the defendant's objection to the prosecutor's argument on the basis that it impermissibly shifted the burden of proof, and the defendant challenged the comments on appeal <u>Id.</u> We held that the comments were not reversible error: "Viewed in context, we find no error in the prosecutor's response regarding the subpoena power of the respective parties. Rather than an impermissible shift of the burden of proof, these comments were a response to defense counsel's argument." <u>Id.</u>

As in <u>Palmer</u>, the prosecutor's rebuttal comments in this case were responsive to the defense's argument that the government had failed to call witnesses whom it had the means to call. Defense counsel emphasized that the government has "money and power" such that it could have easily had an expert to analyze the voices on the wiretapped communications and called that expert to testify at trial. In turn, the prosecutor emphasized that the defense could have easily brought family in to explain the communications or to rebut the government's evidence that the defendants lived at the residences that were targeted for wiretapping. It is apparent to us that the prosecutor's rebuttal statements were to establish the ease with which the defendants could have established that they were not participants in the wiretapped communications just as the defense's arguments attempted to establish the ease with which the government could have scientifically established that the defendants were indeed the participants.

Even if the prosecutor's remarks constitute error, they do not constitute plain error. While Marco objected to the prosecutor's argument, Blas did not object. Thus, plain error review is applicable. <u>See United States v. Diaz-Carreon</u>, 915 F.2d 951, 957-58 (5th Cir. 1990). Thus, we will not reverse Blas's conviction, unless "'the comments seriously affected the fairness, integrity, or public reputation of judicial proceeding[s] and resulted in a miscarriage of justice.'" <u>Id.</u> (quoting <u>United States v. Goff</u>, 847 F.2d 149, 162 (5th Cir. 1988)) (alteration in original). The prosecutor did

19

not state that Blas had an obligation to call any witness. Rather, she responded to the defense's attack on the government's failure to provide voice analyses. Thus, the prosecutor's comments did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings. Moreover, given the volume of evidence that the government presented against Blas, which included numerous wiretapped communications and many seized items, such as a triple beam weight scale, "baggies," money orders, Western Union Money Grams, and telephone numbers in his wallet relating to drug activity, we cannot find that the prosecutor's remarks resulted in a miscarriage of justice.

Also upon reviewing the remarks, we are unable to conclude that they were a comment on Blas' failure to testify. As we have already stated, the prosecutor's statements were a response to the defense's arguments that the government failed to produce voice analyses. Thus, the prosecutor's manifest intent was not to comment on the defendant's silence. Moreover, the character of the remark was not such that the jury would naturally and necessarily construe it as a comment on the defendant's silence.

Accordingly, we find that Blas is not entitled to a reversal of his conviction based on the prosecutor's remarks during rebuttal.

IV.     Propriety of Anguiano's Post-Arrest Interview in Light of the Miranda[8] Rule

Anguiano argues that before he was informed of his Fifth Amendment rights, DEA agents subjected him to a custodial interrogation, under the guise of gathering information for a 202 Personal Background Form, in which he divulged incriminating information about his past residences and family members. The government offered portions of the transcripts from the tape recording of the interview regarding the 202 Personal Background Form into evidence at trial to link Anguiano to the

---

[8]Miranda v. Arizona, 384 U.S. 436 (1966).

20

address and telephone number that DEA agents had monitored in connection with the conspiracy. The government does not claim to have advised Anguiano of his Fifth Amendment rights prior to the interview. Rather, it contends that the interview was not subject to Miranda warnings because the questions that elicited Anguiano's incriminating statements are within the routine booking question exception to the Miranda rule.

Anguiano contends that the information sought by the agents went beyond the typical biographical information covered under the routine booking question exception. He claims that the agents were well aware that the questions being asked were reasonably likely to elicit incriminating statements and that they were at least partially intended to elicit such information.

There is a routine booking question exception to the Miranda rule that covers a person's name, address, height, weight, eye color, date of birth, and current age. Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990) (plurality opinion); Presley v. City of Benbrook, 4 F.3d 405, 408 n.2 (5th Cir. 1993) ("In the wake of Muniz, it has been universally accepted by courts, both federal and state, that a routine booking question exception to the Fifth Amendment exists."). Nevertheless, questions designed to elicit incriminatory admissions are not covered under the routine booking question exception. Muniz, 496 U.S. at 601 n.14 (plurality opinion).

After reviewing the transcript from the interview of Anguiano regarding the 202 Personal Background Form, we are convinced that the questions he was asked were designed to elicit incriminatory admissions. The agents asked him twice if he had ever lived on Morton Street. When he twice denied having lived there, they asked why the address appeared on his driver's license. He responded that it was his sister's address. The agents then questioned Anguiano persistently as to whether he lived on 1333 West 60th Street, in Los Angeles, California, the address to which he was

21

later linked with respect to the conspiracy. They first mentioned the address, asking Anguiano if he had lived there. When he responded that he had not lived there, they asked him again if he had lived there. When he admitted having lived there, they asked him several questions to ascertain how long he had lived at the address. It is obvious from reviewing the transcript that the questions go beyond the routine booking question exception because they were designed to and indeed did elicit incriminatory admissions. We therefore find that the district court erred in admitting these statements from the interview of Anguiano regarding the 202 Personal Background Form.

However, the district court's error in admitting the incriminating statements was harmless beyond a reasonable doubt because the government presented other overwhelming evidence linking Anguiano to the address and phone number associated with him in the conspiracy. See United States v. Paul, 142 F.3d 836, 843 (5th Cir. 1998) (applying harmless error analysis where the defendant claimed a Miranda violation and noting that the court must determine whether the remaining evidence overwhelmingly supports the defendant's guilt beyond a reasonable doubt). In the transcripts of the wiretapped communications, the accuracy of which Anguiano does not challenge, other persons associated the telephone number subscribed to by a woman at 1333 West 60th Street in Los Angeles, California, with Anguiano. Also, the transcripts indicate that Anguiano usually identified himself in conversations by calling his given name, Arnulfo. Moreover, one of the government's witnesses, who had been a monitor and reviewer of the intercepted telephone calls and had heard Anguiano's voice after his arrest, stated that she recognized his voice from having listened to him numerous times on the telephone. The witness, whose primary language is Spanish and who has routinely acted as a Spanish translator, stated, "He's got a very distinct voice, and since I had listened to it numerous times over the telephone, and then just having to listen to him very briefly, I could very well recognize

22

the voice." Additionally, agents in Dallas observed Anguiano go into Madrigal's house and pick up a suitcase. The jury could have easily concluded that the same person identifying himself as Arnulfo in conversations regarding illicit drug activity involving Madrigal and to whom others in the conspiracy had referred on numerous occasions was the same Arnulfo Anguiano observed entering Madrigal's house and leaving with a suitcase.

Accordingly, we find that even though the district court erred in admitting evidence derived from the interview of Anguiano regarding the 202 Personal Background Form, such error was harmless.

V.      Testimony of Agents Bishop and Fallin

Anguiano argues that the district court erred by permitting Agents Bishop and Fallin to testify as to their opinions regarding the structure of the Virgen organization and to assign roles in the organization to Anguiano and others. He contends that the testimony was unnecessary, unhelpful, and unfairly prejudicial hearsay. According to Anguiano, the agents lacked personal knowledge and, at the time their testimony was presented to the jury, there was no substantive evidence on which it could have been based. Anguiano also avers that the testimony was improperly used to bolster the government's weak identification evidence against him regarding the telephone numbers and two residences associated with him.

Anguiano claims that the agents' testimony prejudiced him because the government's evidence was weak and rested almost entirely on the identification of his voice on intercepted wiretapped conversations. The agents' testimony identifying his voice, he argues, was not based on their personal knowledge, but from their review of the intercepted conversations and directing and reading surveillance reports from officers in the field.

23

"The decision whether to admit testimony or other evidence is committed to the sound discretion of the trial judge." United States v. Clements, 73 F.3d 1330, 1334 (5th Cir. 1996). Thus, we review such decisions for abuse of discretion. Id.

Agent Bishop was the lead agent assigned to the investigation. The district court sustained defense counsel's objection to his testimony on the basis of hearsay. Thereafter, the court limited the government's questioning to matters of which Agent Bishop had personal knowledge, including opinions derived from his conducting physical surveillance, listening to the electronic surveillance tapes, and reviewing the transcripts of those tapes. Within these limitations, Agent Bishop described the Virgen organization and the hierarchy of its members. Given that Agent Bishop had personal knowledge of the matters on which he testified, we find no abuse of discretion in the district court's decision to overrule subsequent objections to his testimony.

Agent Fallin supervised the wire room in California and had personal knowledge of certain events as a result of his active participation in the investigation. Anguiano has failed to demonstrate that the district court abused its discretion in allowing his testimony.

VI.     Sentencing

A.      Blas

Blas argues that the district court erred in failing to properly consider his mitigating role in the conspiracy for sentencing purposes. He claims that although, at his sentencing hearing, he argued that he was not a major player in the conspiracy and there was ample trial evidence supporting this contention, the district court made no finding on the issue of whether he played a minor role. He asserts that because he was entitled to a resolution of all of the issues that he raised at sentencing, the

24

district court erred in ignoring his request for a minor role adjustment and thus he is entitled to a remand for re-sentencing.

The government argues that Blas was not a minor participant in the conspiracy for which he was convicted. Furthermore, it asserts that at the sentencing hearing Blas, only briefly alluded to his contention that he was not a major player in the conspiracy and put on no evidence that would have given the district court a factual basis for adjusting his sentence. To the extent that Blas raised controverted factual assertions, the government points out, the district court responded by making findings that adopted the presentence report and the jury's conclusions as to Blas's involvement in the conspiracy.

Under U.S.S.G. § 3B1.2, "[a] district court may reduce a defendant's offense level by two levels if the defendant was a 'minor participant' in the criminal activity, or by four levels if the defendant was a 'minimal participant.'" United States v. Flucas, 99 F.3d 177, 180-81 (5th Cir. 1996) (citing U.S.S.G. § 3B1.2). Such an adjustment is "generally appropriate only if a defendant is substantially less culpable than the average participant." Id. at 180. We review a district court's finding on this factor for clear error. Id.

Blas has wholly failed to demonstrate that the district court's determination that he was not entitled to a downward adjustment for being a minor participant was clearly erroneous. Instead, relying on United States v. Velasquez, 748 F.2d 972, 974 (5th Cir. 1984),[9] he argues that the district court was required to but did not make a specific finding on the issue of whether he played a minor

---

[9]In Velasquez, we found that the district court failed to respond to the defendant's objection to the description of "notorious alien smuggler" in the presentence report and thus violated Fed. R. Crim. P. 32(c)(3)(D), which required the district court to make a finding as to any factual inaccuracy in the presentence investigation report or the summary of the report. 748 F.2d at 974.

role.  We reject Blas's argument.  Our review of the record reveals that Blas did not raise the issue of his level of involvement in the conspiracy.  He did not file written objections to the presentence report's characterization of his level of involvement.   Nor did he verbally object at the hearing.  His counsel only briefly alluded to his being "a smaller part of the conspiracy."   This brief allusion occurred after counsel stated that there were no other matters that he wished to address with respect to his objections and the court adopted the presentence report, overruling Blas's objections.  After addressing Blas's objections, the court gave Blas an opportunity to speak on his own behalf.  When Blas completed his statement, the court asked counsel if he had anything to state before sentencing.  In response to the court's question, counsel stated:

> Other than, Your Honor, my client has always admitted that he was having to do with the money part.  And I've explained to him that there's a conspiracy here, and that he, as part of that conspiracy, can be held accountable for every action that was part of that conspiracy.  And I think that the--that his statement means that he was a smaller part of that conspiracy, perhaps, as far as the money at least was concerned, and whatever else evidence would have shown he was involved with.

> But he was not a major player, and we would hope that the court would take that into account when giving him the sentence.

Counsel's statement cannot fairly be said to have raised the issue of the level of Blas's involvement in the conspiracy or objected to the presentence report's characterization of his involvement. This statement was merely a follow-up to Blas's statement requesting leniency and occurred after the court had already addressed Blas's objections.

Accordingly, we find that the district court did not err in declining to adjust Blas's sentence on the basis that he was a minor participant in the conspiracy.

B.     Anguiano

26

Pursuant to U.S.S.G. § 3B1.1, the district court adopted the recommendation in the presentence report that Anguiano's offense level be increased from 38 to 42 based on his aggravating role in the conspiracy. Anguiano urges this Court to vacate his sentence because there was no reliable evidence supporting the district court's determination that he was a leader/organizer of the conspiracy for which he was convicted. We disagree. The record is replete with evidence that Anguiano was a leader/organizer in the conspiracy. The government established that Anguiano was a major drug source for the Virgen organization. For example, the government presented evidence that persons had attempted to transport a substantial amount of drug money from Daniel and Madrigal to Anguiano in California. There was also evidence that Anguiano suggested that Daniel use Madrigal as an alternate source of methamphetamine. Thus, Anguiano actually introduced Madrigal to the conspiracy. We discern no error in the sentencing court's increase in Anguiano's offense level for his aggravating role in the conspiracy.

### C.    Apprendi Error

Blas, Anguiano, and Madrigal claim that their sentences are contrary to the Supreme Court's recent decision in Apprendi v. New Jersey, 530 U.S. 466 (5th Cir. 2000). Under Apprendi, which was decided after the defendants were sentenced, the district court must submit to the jury any fact, other than a prior conviction, that increases the penalty for a crime beyond the prescribed statutory maximum. Apprendi, 530 U.S. at 490. If the government seeks an enhancement of the penalties for a crime based on the amount of drugs, "'the quantity must be stated in the indictment and submitted to a jury for a finding of proof beyond a reasonable doubt.'" United States v. Delgado, No. 99-50635, 2001 WL 716951, at *11 (quoting United States v. Doggett, 230 F.3d 160, 164-65 (5th Cir. 2000)). If a defendant did not object to the failure of the district court to include the drug quantity in the jury

27

instructions, we will apply only plain error review. Id. Furthermore, assuming that the error was otherwise plain, it is subject to harmless error analysis. Id. Thus, we will grant the defendants relief from their sentences "only if the district court's failure to more specifically instruct the jury that it must find a specific drug quantity beyond a reasonable doubt, was not harmless." United States v. Green, 246 F.3d 433, 437 (5th Cir. 2001). "[T]he standard for determining harmlessness when a jury is not instructed as to an element of an offense is 'whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.'" Id. (quoting Neder v. United States, 527 U.S. 1 (1999)).

Blas, Anguiano, and Madrigal were each charged with and convicted of conspiracy to violate 21 U.S.C. § 841(a)(1), which criminalizes the possession of methamphetamine with the intent to distribute. The penalty for the offense ranges from 10 years to life for persons possessing one kilogram or more of methamphetamine. 21 U.S.C. § 841(b)(1)(A)(viii). However, under this Court's post-Apprendi holding in United States v. Doggett, 230 F.3d 160, 164-65 (5th Cir. 2000), "if the government seeks enhanced penalties based on the amount of drugs under 21 U.S.C. § 841(b)(1)(A) or (B), the quantity must be stated in the indictment and submitted to a jury for a finding of proof beyond a reasonable doubt."

Count 1 of the superceding indictment alleged that Blas, Anguiano, and Madrigal conspired to possess, with the intent to distribute, "one (1) kilogram or more of methamphetamine, a Schedule II controlled substance in violation of Title 21, United States Code, Section 841(a)(1)." The government concedes that the district court did not instruct the jury on the drug quantity.

Blas was convicted of both conspiracy to distribute methamphetamine and conspiracy to launder money. The two counts were grouped together to compute his sentence. The offense level

28

for conspiring to distribute methamphetamine was 38, and the offense level for conspiring to launder money was 26. Because the drug conspiracy violation was the most serious of the counts, it was used to calculate the guideline range. The district court determined that Blas' sentencing range was between 235 and 293 months of imprisonment based on his accountability for fifteen kilograms of methamphetamine. The court sentenced him to 260 months on the drug conspiracy charge and 240 months on the money laundering charge. The sentences are to run concurrently.

Based on his accountability for over fifteen kilograms of methamphetamine and his status as a leader of five or more participants, Anguiano's guideline sentencing range was 360 months to life. The district court sentenced him to 420 months of imprisonment.

Madrigal's sentencing range was 360 months to life because of his accountability for conspiring to distribute more than fifteen kilograms of methamphetamine and his status as a leader/organizer of five or more participants. The district court sentenced him to 420 months of imprisonment.

We are convinced that the record contains no evidence that could rationally lead to a conclusion contrary to the charge that the defendants participated in a conspiracy involving the amount of drugs specifically charged in the indictment. See Green, 246 F.3d at. 437. At trial, there was extensive, detailed and uncontroverted testimony regarding the scope of drug-related activity engaged in by defendants and the quantities of the various drugs they were involved with. There was evidence that the Virgen organization dealt in pound quantities of methamphetamine. The government established that Anguiano and Madrigal were drug suppliers to the Virgen organization, which was an elaborate drug operation that supplied drugs to numerous customers. The government also established that Blas was an active participant in the Virgen organization. Some of his duties

29

included picking up money and delivering methamphetamine. Also, when Daniel and Humberto left town, they placed him and Marco in charge of the organization's operations.

In sum, defendants have failed to meet their plain error burden. Defendants did not dispute the drug quantity evidence at trial and the record convincingly shows that each defendant was involved in a conspiracy related to at least the amount of drugs specifically charged in the indictment. The jury had with it during deliberation a copy of the indictment setting forth the specific quantities of drugs which would support the sentence imposed by the district court. Moreover, the district court instructed the jury that it must find each defendant agreed to commit the crime of distribution of the named drugs "as charged" in the indictment. Having carefully reviewed the evidence in the trial record, we conclude that implicit in the jury's finding on the first element is also a finding of the specific quantities charged in the indictment.

As we have concluded that there was no evidence that could rationally lead a jury to a conclusion that the quantity of drugs stated in the indictment was incorrect, we likewise find that the district court's error in failing to instruct the jury to find a specific amount of drugs beyond a reasonable doubt was harmless. Accordingly, we deny the defendants' request that their sentences be vacated.

## CONCLUSION

For the foregoing reasons, we AFFIRM the defendants' convictions and sentences.

AFFIRMED.